912 So.2d 426 (2005)
Roy LAMBERT, et al., Plaintiffs-Second Appellants
v.
STATE of Louisiana, et al., Defendants-Appellees
Bayou D'Arbonne Lake Watershed District, Defendant-First Appellant.
No. 40,170-CA.
Court of Appeal of Louisiana, Second Circuit.
September 30, 2005.
*428 Hodge O'Neal, III, Monroe, Daniel P. Parker, for Plaintiffs-2nd Appellants, Roy Lambert, Dennis Lambert, John Lambert & Kimberly Lambert Capps.
Richard A. Bailly, Baton Rouge, Laurel McDonald White, Louisiana Dept. of Justice, for Defendant-1st Appellant, Bayou D'Arbonne Lake Watershed.
John F. Frederickson, Assistant Attorney General, for Defendants-Appellees, State of Louisiana, DWLF, DOTD, & DNR.
L. Frederick Shroeder, II, for Defendant-Appellee, Union Parish Sheriff's Office.
Before BROWN, WILLIAMS, and MOORE, JJ.
BROWN, C.J.
Plaintiffs in this wrongful death/survivorship action are the children of Jimmy Lambert and Peggy Lambert, who drowned on February 19, 2001, shortly after launching their small fishing boat from what is known as the "high water boat ramp" adjacent to the Bayou D'Arbonne Lake Spillway/Dam.[1] The high water boat ramp is on the north side of Bayou D'Arbonne just below the spillway. The body of water on the downstream side of the dam is considered Bayou D'Arbonne, while the waters on the upstream side of the spillway are considered Lake D'Arbonne. The dam was placed across Bayou D'Arbonne, thus forming the reservoir known as Lake D'Arbonne.
The Lamberts entered the bayou using only their boat's trolling motor. The water began violently driving their boat westerly, apparently upstream, against the natural flow of the water. This "backwards" undercurrent was so strong that it easily overcame the trolling motor, driving the Lamberts' boat into the spillway and pinning it against the concrete wall of the dam. The water coming over the spillway was so powerful that it destroyed the boat, then tore the life jackets and clothing off the Lamberts, and they drowned.
The reason that the water carried the Lamberts upstream and against the natural current is inherent in the design of the spillway itself. Beneath the water on the *429 downstream side of the dam the concrete is designed to do two things. First, there are structures which cause turbulence in the water in order to dissipate the energy of the water coming over the spillway. Secondly, there is a lip design, which turns the natural current backwards towards the dam, the purpose of this being to avoid or lessen the effects of erosion on the downstream side of the spillway. Most of the time this design scheme presents no danger to small boats, and there is no reason not to get near the spillway wall. However, when the water level above the dam is far higher than the water level below the dam, which usually occurs after a big rain, the waters below the spillway become extremely dangerous. A backflow or "sucking, spinning vortex" is created which "causes things to get pulled into the backside of the dam." According to the Watershed District, the water below the spillway at the boat launch was visibly, obviously hazardous after such a rain. Furthermore, there were warning signs posted at both the high water boat ramp and across the spillway facing Bayou D'Arbonne.
Plaintiffs, the children of Jimmy and Peggy Lambert, filed the instant wrongful death and survival action against the following defendants:
(1) State of Louisiana, Department of Transportation and Development ("DOTD"), which designed and constructed the spillway and the closely adjacent boat ramp.
(2) State of Louisiana, Department of Wildlife & Fisheries ("DWF"), which has sole authority to control and regulate all aspects of boating in the area.
(3) State of Louisiana, Department of Natural Resources ("DNR"), which is responsible for management of the State's waters and encroachments of the beds and water bottoms of navigable waters.
(4) Bayou D'Arbonne Lake Watershed District ("Watershed District"), which has a statutory duty to manage and control the lake.
(5) Union Parish Police Jury, which has settled with plaintiffs and is no longer a party to the suit.
(6) the Sheriff of Union Parish, whose motion for summary judgment was granted and no appeal has been taken therefrom.
The three State defendants (hereinafter referred to collectively as "the State," and individually as the aforementioned acronyms), the Union Parish Police Jury, the Sheriff, and the Watershed District filed motions for summary judgment urging immunity based upon the recreational use statutes, La. R.S. 9:2791 and La. R.S. 9:2795. The trial court granted summary judgment in favor of the State and the Sheriff, but denied the motions filed by the Union Parish Police Jury and the Watershed District.[2]
The Watershed District has appealed, as have plaintiffs, and the State has answered the appeal filed by plaintiffs.

Discussion

Summary Judgment
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 (La.App. 2d Cir.08/21/96), 679 So.2d 477.
*430 Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. La. C.C.P. art. 966(C)(2).
Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion and all doubt must be resolved in the opponent's favor. Row v. Pierremont Plaza, L.L.C., 35,796 (La.App. 2d Cir.04/03/02), 814 So.2d 124, writ denied, 02-1262 (La.08/30/02), 823 So.2d 952.

Immunity Under the Recreational Use Statutes
In determining whether a defendant is afforded immunity under the recreational use statutes, the Louisiana Supreme Court has established a three prong test. Each of the following questions needs to be answered affirmatively for immunity to apply. 1) Is the area where the injury occurred undeveloped, non-residential, and rural or semi-rural? 2) Was the injury the result of activities that can be pursued in the "true outdoors"? 3) Was the injury-causing instrumentality of the type that would normally be encounters in the "true outdoors"? Keelen v. Louisiana Department of Culture, Recreation, and Tourism, 463 So.2d 1287 (La.1985).
This test was legislatively amended in 1985 when La. R.S. 9:2795(B)(1)(c) was changed to add "caused by any defect in the land regardless of whether naturally occurring or manmade." Thus, the third prong of the test was removed. The legislature then effectively removed the first prong of this test in 2001 when it amended La. R.S. 9:2795 by adding the phrase "urban or rural" to section (A)(1) and the phrase "whether urban or rural" to section (E)(2)(a). However, it is important to note that this 2001 amendment was made after the incident that resulted in the Lamberts' deaths. Thus, at the time of the Lamberts' deaths, La. R.S. 9:2795 read in pertinent part:
(A) As used in this section:
(1) "Land" means land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment attached to the realty.
(2) "Owner" means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises.
(3) "Recreational purposes" includes but is not limited to any of the following, or any combination thereof: hunting, fishing, trapping, swimming, boating, camping, picnicking, hiking, horseback riding, bicycle riding, motorized vehicle operation for recreation purposes, nature study, water skiing, ice skating, snowmobiling, snow skiing, summer and winter sports, and viewing or enjoying historical, archeological, scenic, or scientific sites.
(B) (1) Except for willful or malicious failure to warn against a dangerous *431 condition, use, structure, or activity, an owner of land, except an owner of commercial recreational development or facilities, who permits with or without charge any person to use his land for recreational purposes as herein defined does not thereby:
c. Incur liability for any injury to person or property caused by any defect in the land regardless of whether naturally occurring or man-made.
(E) (1) The limitation of liability provided in this Section shall apply to any lands or water bottoms owned, leased, or managed by the Department of Wildlife and Fisheries, regardless of the purposes for which the land or water bottoms are used, and whether they are used for recreational or non-recreational purposes.
(2) a. The limitation of liability provided in this Section shall apply to any lands owned, leased, or managed as a public park by the state or any of its political subdivisions and which is used for recreational purposes.
d. The limitation of liability as extended to parks in the Section shall not apply to intentional or grossly negligent acts by an employee of the public entity.
Plaintiffs argue that before immunity can be granted to any defendant, a factual determination must be made as to whether the area in question was undeveloped, non-residential, and rural or semi-rural. Tragically, in Bradshaw v. Department of Wildlife and Fisheries, et al., 616 So.2d 799 (La.App. 2d Cir.03/31/93), this court was presented with this very issue arising from identical facts occurring at the Bayou D'Arbonne Spillway. In Bradshaw this court ruled that a factual determination of whether the area is "undeveloped, non-residential, rural or semi-rural" was not necessary because "unlike the Keelen court, we are faced with a situation that clearly falls under the language of LSA-R.S. 9:2795 E[1]. In distinguishing the Department [of Wildlife and Fisheries] from other landowners, that provision specifically departs from the requirement of demonstrated use as to recreational purposes." Id. at 802. Finding no reason to stray from this precedent, we hold that the trial court did not err in determining that the immunity granted to the DWF by La. R.S. 9:2795 applies in this case. We next look to whether the trial court erred in extending this same immunity to the DOTD and DNR even though La. R.S. 9:2795 only names the DWF.
In granting the DOTD's and DNR's motions for summary judgment, the trial court cited the First Circuit's ruling in Deumite v. State of Louisiana, 94-1210 (La.App. 1st Cir.02/14/97), 692 So.2d 1127. In Deumite, the First Circuit stated, "we must decide whether the State can be immune from liability for damages incurred because of the action or inaction of one of its executive department agencies and, at the same time, be not immune from liability for the same damages because the action or inaction of another executive department agency was also involved. To paraphrase an old saying, the State cannot be a little bit immune." Id. at 1140.
However, this ruling is in contradiction of the principles of interpreting the recreational use statutes clearly laid out by the Louisiana Supreme Court in Monteville v. Terrebonne Parish Consolidated Government, 567 So.2d 1097 (La.1990). In Monteville, the Supreme Court stated:
The Recreational Use Statutes are in derogation of common or natural right and, therefore, are to be strictly interpreted, and must not be extended beyond their obvious meaning. The rule *432 that statutes in derogation of natural or common right are to be strictly interpreted is now generally recognized as being a corollary of the rule that statutes in derogation of the common law are to be interpreted strictly. This rule is so well settled that it must be presumed that the legislature acted with full knowledge of the strict interpretation of statutes of this nature. The great majority of courts in other states interpreting recreational use statutes have held that because the statutes are in derogation of the common law and because they limit the duties of landowners in the face of a general expansion of premises liability principles, they must be strictly construed. For the purpose of this rule, "common law" should be understood to carry its broadest meaning, i.e., the existing body of law rather than the narrower definition of an ancient body of Anglo-American judge-made principles. Accordingly, where there is any doubt about the intent or meaning of laws in derogation of common law or common right, such as the Recreational Use Statutes, the statutes are given the effect which makes the least rather than the most change in the existing body of law.
Furthermore, the Recreational Use Statutes constitute grants of immunities or advantages to a special class of landowners against the general public. It is an established principle that legislative grants of such rights, powers, privileges, immunities or benefits as against the general public, as distinguished from a right against some other party, should be construed strictly against the claim of the grantee. This is a policy of such fundamental character that it can be said to have its sources in the very conception of law consisting of norms that are general, uniform, and impartial in operation in various constitutional guaranties aimed at assuring equal protection and equal treatment under the law. Id. at 1100-1 (citations omitted).
A strict interpretation of the recreational use statutes cannot extend a limitation of liability to any defendant not clearly identified by the statutes. In this case, La. R.S. 9:2795(E)(1) expressly provides the DWF with a limitation of liability, but does not name the State or any other state agencies. Were we to read this statute as providing immunity to all state agencies, we would be stretching the statute to its broadest possible meaning. A strict interpretation must limit the grant of immunity to the named executive department, which is the DWF. Thus, we find that the trial court erred in granting the DOTD's and DNR's motions for summary judgment as neither of these agencies is granted immunity by La. R.S. 9:2795(E)(1).
Further, this is consistent with the holding in Bradshaw, supra. In that case, this court observed that "[h]ad the Legislature envisioned the narrow interpretation that would subsequently arise through the Monteville decision, our lawmakers may well have chosen to broaden the statute to include agencies other than the Department. However, in view of the mandate of Monteville that recreational use statutes are to be construed strictly against claims of tort immunity, we must conclude that the present enactment does not confer a limitation of liability upon other political subdivisions of the state, such as the District." Id. at 801. Since our decision in Bradshaw and the Supreme Court's decision in Monteville, supra, the legislature has amended La. R.S. 9:2795 at least three times, but has not to date broadened the language of subpart (E)(1). As such, we find no reason to judicially broaden this interpretation.
*433 However, since our ruling in Bradshaw, the legislature has amended La. R.S. 9:2795 as it regards the Watershed District. Specifically, in 1996, the Legislature added subpart (E)(2)(a) which states that "the limitation of liability provided in this Section shall apply to any lands owned, leased, or managed as a public park by the state or any of its political subdivisions and which is used for recreational purposes." The trial court denied the Watershed District's motion for summary judgment after determining that there was a genuine issue of material fact as to whether the land owned and managed by the Watershed District was a "public park."
The recreational use statutes offer no guidance as to the definition of "public park." Thus, we must define this term by its generally prevailing meaning. La. Civ. Code art. 11. According to Webster's New Universal Unabridged Dictionary 1562 (2003), "public" is defined in pertinent part as "open to all persons; maintained at public expense and under public control; open to the view of all." Webster's defines "park" in pertinent part as "an area of land, usually in a natural state, for the enjoyment of the public, having facilities for rest and recreation, often owned, set apart, and managed by a city, state or nation." Id. at 1411.
Further, Black's Law Dictionary 1104 (5th Ed.1979), defines the adjective "public" in pertinent part as "pertaining to a state, nation or whole community; proceeding from, relating to, or affecting the whole body of people or an entire community. Open to all; notorious. Common to all or many; general; open to common use." Black's Law Dictionary 1005 (5th Ed.1979), defines the noun "park" as "an enclosed pleasure-ground in or near a city, set apart for the recreation of the public."
Perhaps most telling is that the area is commonly referred to as the "Spillway Park." The record shows that the Spillway Park is owned and managed by the Watershed District, a political subdivision of the State. The Spillway park is open to the public and provides accommodations for a variety of recreational activities.
Were this area to include simply a boat launch and parking lot, there would be a genuine issue of fact as to whether this area was a public park. However, the record is clear that the area is also used for a number of other recreational activities. In addition to boating and fishing, the area is used for hiking, camping, and picnicking. Consequently, we find that there is no genuine issue of material fact as to whether La. R.S. 9:2795(E)(2)(a) applies. It is clear that the Watershed District is a political subdivision of the State which owns a public park used for recreational purposes. Thus, the limitation of liability provided by subsection (E)(2)(a) is applicable to the Watershed District.
Plaintiffs argue that even if the DWF and the Watershed District are granted the limitations of liability provided by the recreational use statutes, as we have recognized in this case, there is still a genuine issue of material fact regarding whether the warnings provided by the DWF and the Watershed District were adequate to warn of the nature of the dangerous condition, and if the warnings were inadequate, whether this inadequacy was willful or malicious.
Louisiana Revised Statute 9:2795(B)(1) imposes a duty to warn of a dangerous condition upon the owner of land open to any person for recreational use. Also see La. C.C. arts. 2317 and 2317.1; La. R.S. 9:2800; Herbert v. Billwood, LLC., 03-758 (La.App. 3d Cir.12/23/03), 862 So.2d 1227; Leaman v. Continental Casualty Co., 00-0292 (La. *434 App. 4th Cir.09/26/01), 798 So.2d 285, writ denied, 01-3291 (La.03/08/02), 810 So.2d 1165; David v. Reon, 520 So.2d 820 (La. App. 3d Cir.1987), writ denied, 522 So.2d 564 (La.1988). The degree of care which satisfies this duty varies with the danger which will be incurred by negligence and must be commensurate with the danger involved. Calton v. LP & L Co., 56 So.2d 862 (La.App. 2d Cir.1952); Williams v. City of New Orleans, 433 So.2d 1129 (La. App. 4th Cir.1983). In regard to this duty as imposed by the recreational use statute, a failure to warn of a dangerous condition connotes a conscious course of action, and is deemed willful or malicious when action is knowingly taken or not taken, which would likely cause injury, with conscious indifference to consequences thereof. Johnson v. City of Morgan City, 99-2968 (La.App. 1st Cir.12/22/00), 787 So.2d 326; Mullins v. State Farm Fire and Casualty Co., 96-0629 (La.App. 1st Cir.06/27/97), 697 So.2d 750; Price v. Exxon, 95-0392 (La. App. 1st Cir.11/09/95), 664 So.2d 1273.
This court reviewed this same issue in Bradshaw, supra, where the court wrote, "Bradshaw's petition avers in this respect only that, since construction of the dam 25 or 30 years ago, "any number" of drownings have occurred in the same vicinity as the present accident; and, although aware of this, defendants negligently failed to erect proper and adequate signs warning of the "extremely dangerous condition" of the water and currents. Such allegations simply do not specify facts supporting a willful or malicious failure to warn, or even reflecting a risk so great as to make it highly probable that harm would follow." Id. at 802. Fortunately, the record in this case is rich in facts regarding the number of drownings at this specific site as well as the attempts and apparent failures to add additional warnings following five deaths in 1989.
The record is clear that there have been at least 30 similar deaths in this one spot since the spillway opened. In 1981 signs were posted on the spillway and boat launch warning of dangerous currents. Despite these warnings, in 1989 two boats carrying five people were drawn back into the spillway, capsizing, and killing all five people in the exact same manner as the accident that killed the Lamberts. Following these deaths, the Watershed District met to consider available options for adding further warnings of the extremely dangerous conditions during periods of high water. As a result of this meeting, the Watershed District installed a pipe and cable fence to close the high-water boat launch during dangerous conditions and a folding sign, which, when unfolded, stated that the boat launch was closed. At the time of the Lamberts' deaths, the boat launch remained open and the sign had never been unfolded.
There is conflicting evidence in the record as to who was responsible for closing the fence and unfolding the sign during dangerous conditions. Some evidence suggests that this was the DWF's responsibility and other evidence suggests that this was the Watershed District's responsibility. There is even some evidence that six years after the five drownings in 1989, the Watershed District determined that it would no longer use the fence or folding sign. This conflict in the record is sufficient to create a genuine issue of material fact as to whether these governmental entities provided adequate warning of a dangerous condition, and if inadequate, whether this failure to warn was willful or malicious. Thus, even though the DWF and the Watershed District are granted limited liability by the recreational use statute, this limitation of liability does not extend to their possible willful or malicious failure to warn against a dangerous condition. As such, both the DWF's and the *435 Watershed District's motions for summary judgment should have been denied.

Preemption Under La. R.S. 9:2772
Finally, the DOTD argues that its motion for summary judgment should have been granted because plaintiffs' suit against it is preempted by La. R.S. 9:2772. Under this statute, no action may be brought against a designer or builder of immovables or improvements for defects of, in this case, design or construction five years after the owner has occupied or taken possession of the improvement. The DOTD argues that while it constructed the boat launch, the Watershed District is the owner and had taken possession more than five years prior to the Lamberts' deaths.
Even if this is true, the DOTD does not escape potential liability as pertains to the dam. Though the record is not clear, it appears that the state owns the dam. Part of the plaintiffs' case is that the dam is flawed in that its design creates the vortex which pulls boaters against the natural current of the bayou and into the spillway structure, resulting in death. The DOTD has not made it clear who the owner of the dam is and whether it is still responsible for the upkeep and improvements to this structure. As such there remains a genuine issue of material fact as to whether this preemption applies to the DOTD. For this reason, the DOTD's motion for summary judgment should have been denied.

Conclusion
Immunities provided by the recreational use statutes must be strictly interpreted. As such, since the DWF is the only state agency named by the statute, the DOTD and the DNR are not granted immunity. Further, there remain genuine issues of material fact as to whether the plaintiffs' suit against the DOTD is preempted by La. R.S. 9:2772. Thus, trial court erred in granting the DOTD's and the DNR's motions for summary judgment.
While both the DWF and the Watershed District are granted limited liability under La. R.S. 9:2795, this limitation does not extend to a willful or malicious failure to warn of a dangerous condition. The record provides ample evidence to suggest that the Watershed District and/or the DWF failed to provide adequate warning and that this failure was willful. Thus, we find that the trial court erred in granting the DWF's and the Watershed District's motions for summary judgment.
For the reasons set forth above, that part of the trial court's judgment denying summary judgment to the Watershed District is affirmed. The remainder of the judgment, which granted summary judgment in favor of the Department of Transportation and Development, the Department of Natural Resources, and the Department of Wildlife and Fisheries, is hereby REVERSED.
This matter is REMANDED for further proceedings. AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
As allowed by applicable statutory authority, costs are assessed to the Watershed District, the Department of Transportation and Development, the Department of Natural Resources, and the Department of Wildlife and Fisheries.
NOTES
[1] Persons familiar with the entire Bayou D'Arbonne area use the terms "spillway" and "dam" interchangeably when referring to the structure itself. On the other hand, there are just as many people who use the word "spillway" to refer to the lake, the dam, and the spillway structure itself, as well as the waters on the downstream side of the dam.
[2] As noted above, the summary judgment in favor of the Sheriff dismissing plaintiffs' claims against him is final, and plaintiffs and the Union Parish Police Jury have reached a settlement, so the police jury is no longer a party to this suit.