GASKINS, J.
11 This case involves the drowning death of the plaintiffs father in Loggy Bayou, allegedly due to unusual currents caused by the opening of the Lake Bistineau spillway gates. The plaintiff sued the Louisiana Department of Wildlife and Fisheries (DWF) and the Louisiana Department of Transportation and Development (DOTD), asserting breach of their duty to post warnings or close Loggy Bayou due to dangerous currents. The trial court granted the defendants’ motions for summary judgment, as well as their motion to strike the affidavit of the plaintiffs expert witness. The plaintiff appeals the trial court judgment granting these motions. We affirm.
FACTS
On September 19, 2000, Shelly Eugene Mayaze and Jimmy Caskey went on a fishing trip to Lake Bistineau. They traveled on Loggy Bayou in a motor boat operated by Mr. Caskey. At some point, the boat capsized, and both men fell into the water. Mr. Caskey survived but was arrested for DWI-Second Offense. Mr. Mayaze’s body was recovered two days later.
In September 2001, Mr. Mayaze’s daughter, Rhonda Lynette Mayaze Wood, filed the instant wrongful death/survival action against the DWF as the party responsible for the proper and safe administration of Loggy Bayou and Lake Bisti-neau. The plaintiff also named the DOTD as a defendant alleging that, pursuant to its repair of a bridge, it requested that the spillway be opened to lower the lake. She contended that the defendants had a duty to ensure Loggy Bayou remained safe by either placing warning signs or closing the portion of the bayou containing dangerous currents.
[aIn April 2007, the DOTD and the DWF filed separate motions for summary judgment. Both motions asserted that the water draining into Loggy Bayou pursuant to a drawdown of Lake Bistineau had been flowing for more than two weeks prior to the drowning and was obvious to any prudent boater. Additionally, they stated that notice and warnings about the draining of the lake had been publicized.
Both motions for summary judgment relied upon the same exhibits: the 2006 affidavit of Sergeant Wesley D. Walker of the DWF law enforcement division; the 2007 affidavit of Captain Wesley D. Walker of the DWF law enforcement division [1]; certified copies of two articles in The Times in Shreveport dated August 17 and 26, 2000, announcing the drawdown of Lake Bisti-neau; a certified copy of the Bossier Press-Tribune article dated August 7, 2000, also announcing the drawdown of the lake; and the affidavit of Harvey Christian, a professional engineer with DOTD.
*283 In his first affidavit, Captain Walker attested to the fact that the lake’s dam gates had been open for two weeks at the time of the accident; that the flow, current and movement of the water was visible to anyone boating in the area; and that he personally participated in the investigation of the boating accident which happened two to three miles south of the dam. The attached reports showed that Mr. Caskey was arrested for DWI-Second offense following the incident.[2] Captain Walker’s second affidavit likewise | included his statements that the dam gates had been open for two weeks before the incident; that the “flow, current and movement of the water would be clearly visible to anyone in the area or boating in the area in the same manner of heavy rains”; and that DWF is not mandated to prohibit or restrict lawful boat access near the dam. In both affidavits, Captain Walker affirmed that the area is primarily undeveloped, rural and sparsely populated woodlands used for such recreational activities as boating and camping.
In his affidavit and its accompanying exhibits, Mr. Christian established that the drawdown was a joint project whereby DWF requested that the dam gates be opened so the lake could be “dewatered” at a specific daily rate with DOTD performing the actual drawdown. The purpose of the drawdown was “to accomplish noxious aquatic vegetation control and fisheries habitat improvement.” He stated that no unsafe conditions were known or reported to him during the duration of the draw-down which began on September 5, 2000, and that as a professional engineer, he did not believe any unsafe conditions were caused by the drawdown. Furthermore, he attested that the drawdown process was constantly monitored to assure safety for any prudent boater or fisherman. According to Mr. Christian, the records showed that for the period of September 14-19, 2000, there was a “slowly, but steadily decreasing flow [emphasis his]” which resulted in an average 2.7 inches per day drawdown rate. Furthermore, he stated that the calculations for the water flow through the dam gates for September 19, 2000, showed it was equal , to or exceeded the amount naturally passing over the spillway during rainfall events many times each year.
| ¿In August 2007, the plaintiff filed a response to the motions for summary judgment in which she asserted that the affidavit and deposition of her expert, Captain Robert Bell, JAGC, USN (Ret.), demonstrated that there were genuine issues of material fact. Specifically, she pointed to his testimony that there were extensive safety measures in the DOTD project plans for warning land traffic but nothing pertaining to the safety of boats in the lake near the dam or in the spillway into Loggy Bayou. According to his affidavit, Captain Bell is retired from the Navy Judge Advocate General Corps, where he worked on maritime claims, and he currently works as a civilian consultant. He claimed to have visited the Loggy Bayou area in late December 2000, during the drawdown period that began September 5, 2000, and ended January 29, 2001.- He stated that during his inspection of the area where the accident occurred, he observed whirlpools and other turbulence in the currents. He also recounted that when he was there, the boat ramp supposedly used by Mr. Caskey was closed and warnings had been issued. Captain Bell noted that after the accident, due to “turbulent” waters, the authorities *284 were not willing to conduct an extensive search for the decedent’s body until the spillway gates were closed. He also asserted that there is no evidence that Mr. Caskey’s intoxication caused the accident.
In September 2007, the defendants filed a motion to strike Captain Bell’s affidavit. Among other things, they alleged that he was not an expert in any field about which he gave opinions — engineering, hydraulics, hydrology or recreational boating regulations. They contended that he made many statements in his affidavit that cannot be peer reviewed by other |ñverified experts. Furthermore, he has never been qualified as an expert in any Louisiana court. Factually, they asserted that, contrary to his affidavit, he did not visit the accident site until December 2001, more than a year after the accident and at a time when the spillway gates were closed.[3] Also, the bridge repair referenced in the plaintiffs petition and Captain Bell’s deposition was not even let for bid until after the accident at issue here. Because the affidavit failed to meet the Daubert[4] standards, the defendants asked that it be stricken.
In support of their motion to strike, the defendants submitted a second affidavit from Mr. Christian, their expert civil engineer, in which he stated — with supporting documentation attached — that the Lake Bistineau bridge project in question was not approved until December 5, 2000, and not bid until January 24, 2001. Consequently, contrary to the plaintiffs conjecture, the bridge project was unrelated to the lake drawdown. Mr. Christian also attested, based upon the records kept by the state, there have been periods of time from January 1, 1996, to August 1, 2007, when the natural water flow over the spillway from rains and naturally occurring conditions exceeded any water flow produced by the open gates from September 14-19, 2000. Thus, contrary to the assertions of Captain Bell’s affidavit, any water flow created by any gate opening was not a unique occurrence that had not naturally existed many times before and after September 14-19, 2000.
| fiIn October 2007, the plaintiff replied to the motion to strike, contending that it was an improper device by which to test the competency of her expert. She submitted a second affidavit from Captain Bell, in which he stated that since he was recognized in the U.S. Navy as a niche expert in several areas, he should be recognized as an expert in the instant case. He also asserted that he had recreational boating experience.
In November 2007, the defendants objected to the plaintiffs opposition and supplemental affidavit. They asserted that there was no rehable scientific method or analysis of the water conditions at the time of the accident presented for review. They also attached a portion of Captain Bell’s deposition in which he stated that he did not actually visit the accident site until December 2001, in contradiction to his affidavit assertion of December 2000.
A hearing on the motion to strike and the motions for summary judgment was held on November 19, 2007. The trial court found that the motion to strike was a proper procedural device. Finding that none of the Daubert factors had been met, it held that Captain Bell’s experience was not of a sufficient magnitude to rise to the level of being qualified as an “expert.” Notably, there was no evidence submitted *285 of scientific methodology or technique used in Captain Bell’s assessment of the conditions of the Loggy Bayou area that would allow the court to make a determination of reliability. Also, Captain Bell was not present at the hearing to be examined as to his qualifications or methodology. Since |7the affidavits did not provide sufficient proof of his expertise, the court granted the motion to strike.
As to the motions for summary judgment, the trial court found that the DWF was entitled to immunity pursuant to La. R.S. 9:2795. Although it did not find the DOTD was entitled to immunity, the court noted that without Captain Bell’s affidavit, there was no other evidence in opposition to the DOTD’s motion for summary judgment. Finding that there was no genuine issue of material fact as to the DOTD, the court granted summary judgment in its favor also.
Judgment was signed December 11, 2007. Pursuant to a request by the plaintiff, the trial court issued written reasons for judgment on January 4, 2008.
The plaintiff appeals.
MOTION TO STRIKE

Law

Affidavits are subject to challenge by way of a Daubert hearing, a motion to strike, or counter affidavits. Independent Fire Insurance Company v. Sunbeam Corporation, 1999-2181 (La.2/29/00), 755 So.2d 226. The inadequacy of an affidavit is a “formal defect,” and the opponent waives the defect unless he or she files a motion to strike or otherwise objects to the affidavit. Independent Fire Insurance Company, supra.
In considering whether expert opinion testimony will be admissible at trial, the Louisiana Supreme Court adopted the Daubert standards as those to be utilized by Louisiana courts. State v. Foret, 628 So.2d 1116 (La.1993).s At the summary judgment stage, the DauberL-Foret standards should be considered by the trial judge in deciding whether to admit expert opinion evidence. Independent Fire Insurance Company, supra.
The court must not attempt to evaluate the persuasiveness of competing scientific studies. In performing its gatek-eeping analysis at the summary judgment stage, the court must focus solely on the principles and methodology, not on the conclusions that they generate. Daubert, 509 U.S. at 595, 113 S.Ct. 2786; Independent Fire Insurance Company, supra.
In fulfilling this gatekeeping role, the trial judge must ensure that the proffered evidence is not only relevant, but reliable, by utilizing a flexible approach requiring that consideration be given to factors such as whether the technique can be (and has been) tested, whether it has been subjected to peer review and publication, whether there is a known or potential rate of error, and whether the relevant scientific/expert community generally accepts the technique. Daubert, 509 U.S. at 593-594, 113 S.Ct. 2786; Corkern v. T.K. Valve, 2004-2293 (La.App. 1st Cir.3/29/06), 934 So.2d 102.
If a party submits expert opinion evidence in opposition to a motion for summary judgment that would be admissible under DauberL-Foret and the other applicable evidentiary rules, and is sufficient to allow a reasonable juror to conclude that the expert’s opinion on a material fact more likely than not is true, the trial judge should deny the motion and let the issue be decided at trial. Independent Fire Insurance Company, supra; Willis v. Medders, 2000-2507 (La.12/8/00), 775 So.2d 1049.
*286 [ ^Discussion
The plaintiff argues that the trial court erred in granting the motion to strike Captain Bell’s testimony. Specifically, she contends that the trial court should have treated the motion like an exception of no cause of action, considering only the pleadings.
The defendants assert that the trial court did not abuse its discretion in excluding Captain Bell’s affidavits. They cite Independent Fire Insurance Company, supra, in support of their argument that a motion to strike was the proper procedural device to challenge Captain Bell’s affidavits on the basis of Daubert. The defendants also point out the deficiencies of Captain Bell’s affidavits, including evidence that the date given in his affidavit for his on-site inspection was incorrect and the lack of evidence that the conditions at the lake at the time of his visit were similar to those at the time of the decedent’s death. According to the defendants, the trial court correctly granted the motion to strike due to the lack of any discernible methodology or scientific testing on the part of Captain Bell.
We agree with the defendants that the motion to strike was the correct procedural device by which to challenge Captain Bell’s affidavit. See Independent Fire Insurance Company, supra.
Review of Captain Bell’s initial affidavit and the subsequent one detailing his water-related experiences fails to reveal that he has such specialized knowledge that he may be considered an expert. The information contained in his affidavits was not based upon any scientific tests or data. Nor was there any indication that Captain Bell employed any [ ^technique or methodology, much less one that could be tested, subjected to peer review and publication, or accepted by a relevant scientific or expert community. There is also some question as to Captain Bell’s ability to determine exactly where the accident occurred; Captain Walker’s first affidavit indicated only that it happened two to three miles from the dam. Like the trial court, we are forced to conclude that there is no scientific methodology or technique used in Captain Bell’s assessment of the conditions of Loggy Bayou that would permit a finding of reliability.[5]
Consequently, we find no error in the trial court’s granting of the motion to strike Captain Bell’s affidavits. Accordingly, the motions for summary judgment will be resolved without consideration of these documents.
SUMMARY JUDGMENT

Law

Summary judgment procedure is favored and is designed to secure the just, speedy and inexpensive determination of actions. La. C.C.P. art. 966(A)(2); Mosley v. Temple Baptist Church of Ruston, Louisiana, Inc., 40,546 (La.App.2d Cir.1/25/06), 920 So.2d 355.
*287 | n Appellate courts review summary-judgments de novo under the same criteria that govern a district court’s consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991); Costello v. Hardy, 2003-1146 (La.1/21/04), 864 So.2d 129. A court must grant a motion for summary judgment “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B).
The burden of proof remains with the movant. La. C.C.P. art. 966(C)(2). However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2).

DWF

DWF was dismissed from the lawsuit because the trial court found it was entitled to immunity under La. R.S. 9:2795, one of the recreational use statutes. The plaintiff does not address this statute in her brief. |12The defendant asserts that this court’s de novo review will show that DWF was entitled to immunity.
Immunity statutes are strictly construed against the party claiming the immunity. Reed v. Employers Mutual Casualty Company, 32,257 (La.App.2d Cir.9/22/99), 741 So.2d 1285, writs denied, 1999-3060 & 1999-3061 (La.1/7/00), 752 So.2d 864.
At the time of the decedent’s death in 2000, La. R.S. 9:2795 provided, in relevant part:
A. As used in this Section:
(1) “Land” means land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty.
(3) “Recreational purposes” includes but is not limited to any of the following, or any combination thereof: ... fishing, ... boating....
B. (1) Except for willful or malicious failure to warn against a dangerous condition, use, structure, or activity, an owner of land, except an owner of commercial recreational developments or facilities, who permits with or without charge any person to use his land for recreational purposes as herein defined does not thereby:
(a) Extend any assurance that the premises are safe for any purposes.
(b) Constitute such person the legal status of an invitee or licensee to whom a duty of care is owed.
(c) Incur liability for any injury to person or property caused by any defect in the land regardless of whether naturally occurring or man-made.
E. (1) The limitation of liability provided in this Section shall apply to any lands or water bottoms owned, leased, or managed by the Department of Wildlife and Fisheries, regardless of the pur *288 poses for which the land or water bottoms are used, and whether they are used for recreational or nonrecreational purposes.
_Jj^(2)(a) The limitation of liability provided in this Section shall apply to any lands owned, leased, or managed as a public park by the state or any of its political subdivisions and which are used for recreational purposes.
(d) The limitation of liability as extended to parks in this Section shall not apply to intentional or grossly negligent acts by an employee of the public entity.
Section E(l) of the statute affords immunity to DWF in this case involving the drowning death of the plaintiffs father while boating and fishing in the rural and undeveloped area at Loggy Bayou. Under the provisions of section (B)(1), this immunity does not apply in the event of “willful or malicious failure to warn against a dangerous condition.” In regard to this duty as imposed by the recreational use statute, a failure to warn of a dangerous condition connotes a conscious course of action, and is deemed willful or malicious when action is knowingly taken or not taken, which would likely cause injury, with conscious indifference to consequences thereof. Lambert v. State, 40,170 (La.App.2d Cir.9/30/05), 912 So.2d 426, writs denied, 2005-2310 & 2005-2311 (La.4/17/06), 926 So.2d 509.
As a general rule, DWF owed a duty to discover any unreasonably dangerous condition on the premises and either correct it or warn potential victims of its existence. However, this duty does not extend to potentially dangerous conditions which should have been observed by an individual in the exercise of reasonable care or which are as obvious to a property owner as to a visitor. Price v. Exxon Corp., 95 0392 (La.App. 1st Cir.11/9/95), 664 So.2d 1273.
1 uThe record is devoid of any evidence of a dangerous condition. No evidence was introduced to show any other accidents caused by similar conditions. Consequently, the plaintiff did not prove any “willful or malicious failure to warn against a dangerous condition” on the part of the DWF.[6] Such would be an essential element of the plaintiffs case to establish that DWF was not entitled to immunity under La. R.S. 9:2795. To the contrary, the affidavits submitted by the movants contend the flow was controlled at a rate of about two and a half inches per day. Further, the movants demonstrated that the flow, current and movement of the water were readily visible to anyone boating in the area. Since the plaintiff, who would bear the burden of proof at trial, failed to produce factual support sufficient to establish that she will be able to satisfy her evidentiary burden of proof at trial on this matter, there is no genuine issue of material fact.
Accordingly, we find that summary judgment in favor of DWF on the basis of immunity is appropriate under the facts presented in this record.

DOTD

The defendants argue that the record indicates no negligence on the part of the *289 DOTD under a duty/risk analysis. They also assert that there is no showing of an unreasonable risk of harm from the water.
Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis, which entails five separate elements: (1) whether the defendant had a duty to conform his conduct to a specific | ir,standard (the duty element); (2) whether the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) whether the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element). McCoy v. Liberty Mutual Life Insurance Company, 42,118 (La.App.2d Cir.5/9/07), 956 So.2d 802. A negative answer to any of the inquiries of the duty/risk analysis results in a determination of no liability. Hanks v. Entergy Corporation, 2006-477 (La.12/18/06), 944 So.2d 564.
The threshold issue in any negligence action is whether the defendant owed the plaintiff a duty, and whether a duty is owed is a question of law. Hanks v. Entergy Corporation, supra.
The degree to which a danger is evident to a potential victim is one factor in determining whether the condition is unreasonably dangerous. Washauer v. J.C. Penney Company, Inc., 2003-0642 (La.App. 1st Cir.4/21/04), 879 So.2d 195.
With the proper exclusion of Captain Bell’s affidavits, the evidence put forth by the DOTD in support of its motion for summary judgment stands unrefuted. On several occasions prior to the decedent’s drowning in Loggy Bayou, news stories were published in local newspapers advising the public of the upcoming drawdown. The affidavits and accompanying exhibits showed that during the drawdown, the water of Lake Bistineau was |1fidrained at a specifically calculated rate and that the drawdown was properly supervised by state employees. The effect of opening the spillway gates was to increase the water flow similar to that occurring in a heavy rain; in fact, the recorded data demonstrated that the amount of this water flow from the drawdown was duplicated by natural rainfall on several occasions. The water flow was visible to any reasonably prudent and unimpaired boater; unfortunately, the record indicated that the operator of the boat in which the decedent was traveling was impaired enough to be arrested for a DWI offense.[7] Also, there is no proof of where the boat launched so as to show that warnings posted at the wildlife preserve would have been seen by the decedent or Mr. Caskey.
Based on the foregoing, in the absence of genuine issues of material fact and as a matter of law, we find that the DOTD is entitled to summary judgment. There is *290 no evidence that the DOTD breached any duty to the decedent.
We find that summary judgment in favor of the DOTD is appropriate under the circumstances presented herein.
|17C0NCLUSI0N
The judgment of the trial court is affirmed. Costs of this appeal are assessed to the appellant.
AFFIRMED.

. We note that the two Walker affidavits are apparently from the same person who was promoted from sergeant to captain in the 14-month interval between the execution of the affidavits.

. According to the reports, the accident occurred at about 3 p.m. on September 19, 2000; when Mr. Caskey took a breath test at 7:30 p.m. that day, the results were 0.067g percent.

. The actual date of his visit, December 2001, was established in Captain Bell’s deposition, which was attached to his affidavit as an exhibit.

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. It is also noteworthy that many of the underlying bases of Captain Bell's opinion appear to be faulty. Contrary to the assertion in his first affidavit that he inspected the area within months of the accident, he did not actually visit the site until more than a year after the decedent's death. Although the plaintiff contended that the conditions at the accident site on the day of Captain Bell's inspection were similar to those on the day the decedent died, no evidence substantiates this claim. At the time of his inspection, there was not a controlled drawdown in progress but a natural condition of overflow at the closed spillway gates. Also, many of the statements he made in his deposition about warnings to people above the dam but not those below it were connected to a bridge repair contract that was not even bid out until after the accident.

. In this respect, the present case is distinguishable from the Lambert case, where evidence was presented of at least 30 other drowning deaths in the same area where the plaintiffs’ parents died. The appellate court there reversed the granting of summary judgment in favor of DWF, finding that there was a genuine issue of material fact as to the adequacy of the warnings and, if inadequate, the question of willful or malicious failure to warn.

. It is evident from the information in the record that the waters of Loggy Bayou were visibly active on the day of the accident. The boating accident report attached to Captain Walker’s affidavit contains two references to the water being "choppy.” There is a notation, apparently by Captain Walker, that there was "choppy water due to dam dishg.[sic]” At another point, he refers to no diving or dragging operations being done initially after the boat was retrieved due to "turbulent waters being released from Lake Bistineau.” The factors marked by the officer as contributing to the accident were "hazardous waters,” "alcohol use,” and "operator inattention.” When marking the description of "water conditions,” the officer marked “Choppy (waves 6" to 2'),” the second least turbulent description. The other possible descriptions were: “Calm (waves less than 6"),” "Rough (waves 2' to 6')”, "Very Rough (greater than 6’),” and "Strong Current.”