9 So.3d 1035 (2009)
Demetris ROBINSON, Individually and on Behalf of Her Deceased Son, Rayvon Robinson
v.
JEFFERSON PARISH SCHOOL BOARD, Southern Baptist Camping Association, Tall Timbers Baptist Conference Center and Sam White c/w
Raynell Bailey, Individually and on Behalf Of His Deceased Son, Rayvon Robinson
v.
Jefferson Parish School Board, Southern Baptist Camping Association, Tall Timbers Baptist Conference Center and Sam White.
Nos. 08-CA-1224, 08-CA-1225.
Court of Appeal of Louisiana, Fifth Circuit.
April 7, 2009.
Rehearing Denied April 29, 2009.
*1037 Lionel H. Sutton, III, Attorney at Law, New Orleans, LA, for Plaintiff/2nd Appellant.
Marc E. Johnson, Attorney at Law, Kenner, LA, for Plaintiff/Appellant.
Michael G. Fanning, Attorney at Law, Gretna, LA, for Defendant/Appellee.
James M. Benson, Attorney at Law, Lakeway Two Metairie, LA, for Defendant/Appellee.
Panel composed of Judges CLARENCE E. McMANUS, FREDERICKA HOMBERG WICKER, and JEROME M. WINSBERG, Pro Tempore.
FREDERICKA HOMBERG WICKER, Judge.
In these consolidated wrongful death and survival action proceedings, the parents of a 20-year-old son have appealed the granting of a summary judgment. Tragically, their son drowned in a lake during a high school ROTC camping trip. Demetris Robinson (the mother), and Raynel Bailey (the father) individually and on behalf of their deceased son Rayvon Robinson filed separate petitions for damages against defendants/appellees Jefferson Parish School Board, Southern Baptist Camping Association,[1] Tall Timbers Baptist Conference Center and Sam White. The cases were allotted to different divisions of the District Court but the father's case was later transferred and consolidated with the mother's case. The plaintiffs alleged that the defendants were negligent in several respects, including failure to adequately supervise Rayvon, failure to perform a timely and adequate search, failure to train employees or agents in proper supervision of campers and students; failure to timely notify authorities of the disappearance; failure to adequately provide for Rayvon's safety; and creating or allowing hazardous conditions to exist. The father sought additional punitive and exemplary damages. The key issues in *1038 this case are: (1) Are Tall Timbers and Sam White immune from liability pursuant to the Recreational Use Statutes? (2) Did Jefferson Parish School Board breach its duty of reasonable care? Finding that there are no genuine issues as to material fact concerning these issues, we affirm.

Facts
It is undisputed that on March 17, 2006, Rayvon, a Jefferson Parish Bonnabel High School Student, attended a ROTC trip at the Tall Timbers Baptist Conference Center in Woodworth, Louisiana. Riverdale High School ROTC's Colonel James T. Webb arranged the trip. The next morning on March 18, 2006, Colonel Webb discovered that Rayvon was missing. Approximately 10 days later, his body was found in the lake. He was clothed and his boots were on. Approximately one year later, his cell phone and wallet were discovered near the lake. At the time, Rayvon was age 20.
Sam White and Tall Timbers filed a motion for summary judgment as did Jefferson Parish School Board. In support of its motion for summary judgment, Sam White and Tall Timbers relied on Mr. White's affidavit and Colonel James T. Webb's deposition. Jefferson Parish School Board relied on the Webb deposition, the autopsy report, and Ms. Robinson's deposition.
According to the March 29, 2006 autopsy report, Rayvon died on March 28, 2006 as a result of asphyxia due to accidental drowning. No significant injuries were present.
In his affidavit, Mr. White averred that he is the director of Tall Timbers Baptist Conference Center. He stated that Tall Timbers is a 123-acre facility that is adjacent to a portion of the Kisatchie National Forest in Rapides Parish. It has lodges and cabins with rooms to accommodate up to 400 people. It also has a dining facility, a swimming pool, an activity center, and a "ropes course." Most of the remainder of the grounds is heavily wooded except for a lake, which is about ten acres in size.
Mr. White described the relationship between Tall Timbers and the Louisiana Baptist Convention. He stated that Tall Timbers is owned and comes under the umbrella of the Executive Board of the Louisiana Baptist Convention. Tall Timbers is heavily subsidized by the Executive Board. Tall Timbers' mission is to provide people with the type of atmosphere they desire as they seek God's will and the peace that He promises.
According to Mr. White, Tall Timbers operates at a substantial loss, which is made up through an annual subsidy provided by the Convention. For the years 2005 through 2007, Tall Timbers received subsidies from the Convention that ranged from $131,930.76 to $271,041.96.
Mr. White averred that at the time of this accident, Tall Timbers had 11 full time employees, and several part time employees, with the number depending upon the time of year. These employees operated the facility, but were not directly involved with any activity of visiting groups except for the facility's "rope course," swimming pool, or pedal boats. Tall Timbers was not involved in any of the ROTC group's activities prior to Rayvon's disappearance. No one from Tall Timbers approved, participated in, or chaperoned any ROTC activity before Rayvon's disappearance.
Mr. White described the events that followed Rayvon's disappearance. He averred that Kevin Tichey, a maintenance worker at Tall Timbers, called Mr. White at 7:30 a.m. on March 19, 2006, and told him that Rayvon was missing. Two Tall Timbers' performed a search of the buildings while Mr. White was enroute to Tall *1039 Timbers. When one of the employees reported that all of the buildings had been searched, that the ROTC members had searched all of the tents and areas where they had conducted activities the night before, and that Rayvon had not been found, Mr. White immediately called 9-1-1.
Mr. White stated that a sheriffs deputy arrived at approximately 9:30 a.m. Thereafter, a search team searched the grounds. The search ended at dusk on the March 19th and resumed at sunrise on the 20th. Detective Gary Bradford called off the search at 11:00 a.m. on Sunday, the 20th, stating his belief that Rayvon had simply left the grounds in an attempt to get to Jackson, Mississippi, to visit his girlfriend.
According to Mr. White, on March 28, 2006, Tall Timbers maintenance Manager, Glen Smith, saw Rayvon's body floating in the water near the north bank. Mr. Smith contacted Mr. White and Mr. White immediately called 9-1-1. The sheriffs department removed the body from the water. Rayvon was wearing his ROTC T-shirt, camouflage pants, and boots. Neither Mr. White nor anyone at Tall Timbers knows how or why Rayvon entered the lake on March 18 or 19, 2006. More than a year after Rayvon's death, maintenance workers trimming the perimeter of the lake found Rayvon's wallet and cell phone on the bank of the south side of the lake.
Colonel Webb testified in his 2007 deposition that for approximately three years, he had been a senior Air Force instructor at Riverdale High School, which is within the Jefferson Parish school system. Before that, he had been employed by the St. Charles Parish school system approximately 11 years in that capacity. After his 1993 military service retirement, he had taken over the ROTC program in St. Charles Parish. Colonel Webb explained that as a ROTC instructor, he was employed as a teacher within the state system.
He testified that students became eligible for ROTC when they entered the ninth grade. ROTC students were required to take courses in the ROTC curriculum. All other activities, such as field trips after school and on the weekend, however, were voluntary.
Colonel Webb stated that one such outside activity was "snake school." This was the activity that took place at Tall Timbers. Although this was the first time they had conducted a "snake school" at Tall Timbers, this was not the first time they had conducted "snake school." Colonel Webb testified that he conducted the "snake school" program for approximately nine years at Destrehan High School. Before the Tall Timbers' trip, he had also previously conducted the program in Jefferson Parish at other facilities.
He testified that his principal coordinates the offer of the "snake school" program to other schools in the school system. Two to three months before they went to Tall Timbers, Sergeant Whitener surveyed the location. Based on Sergeant Whitener's recommendation, they decided to conduct the "snake school" at Tall Timbers. The Colonel stated that he had never visited the site before actually arriving for "snake school" although he occasionally spoke with someone at Tall Timbers to discuss some details.
Colonel Webb stated that he believed he had 12 chaperones for the trip consisting of four National Guard members, five parents, and three instructors. Sixty-eight students from four high schools, including Riverdale and Bonnabel, attended the "snake school."
Colonel Webb testified that Tall Timbers was required to meet basic requirements in order to meet their needs in *1040 conducting a "snake school." These needs consisted of some manner in which to feed the students, two separate camping areas, a low ropes course, and a high ropes course. Details of the "snake school" activities were spelled out in a contract that they signed with Tall Timbers. The contract had details regarding ropes, camping requirements, and the dining facility.
He stated that the "snake school" required two campsites because students were divided into two squadrons: the Alpha squadron and the Bravo squadron. He explained that there was a competition to capture the other squadron's flag.
Colonel Webb testified that basically Tall Timbers was not part of the "snake school" activities although the ropes' instructors were arranged through Tall Timbers. However, he did not think that the ropes' instructors were employees of Tall Timbers.
Colonel Webb testified that they arrived in buses at Tall Timbers. He spoke to Rayvon on the bus in an attempt to know the students who did not attend Riverdale. Upon arrival at Tall Timbers, the students and chaperones unloaded their gear from the buses. Then, they went over the ground rules, including safety rules with everyone. Sergeant Whitener walked with both squadrons on a daylight tour of the area to identify the operating area and to show where the students were permitted to go and where they were prohibited from going. They went over the safety rules with them again and then they finished setting up their camps. They took the students to the other unit's encampment so they knew where that was and vice versa. There was a lake in the middle of the camps. After they finished setting up their camps, they started the "capture the flag" game. Colonel Webb stated that he gave the students a time limit of 4:00 a.m.
Colonel Webb described the game. He stated that the goal was that each squadron had a flag posted in the encampment. And their job was to defend it against the other squadron. A student was captured by getting tagged by the other side. The students were never to go anywhere alone without a partner. If the partner were captured, the student had to return to his camp and procure another partner. However, the students were not required to participate in the "capture the flag" game. There were a few students who did not want to participate.
Colonel Webb testified that he saw Rayvon before the game started. At the time, the colonel had remarked that Rayvon's tent was crowded. Colonel Webb learned that Rayvon left his tent and his camping supplies at Riverdale. Therefore, he was placed in a tent with four other students. Colonel Webb stated that he did not recall seeing Rayvon after the game started.
Colonel Webb was asked about his instruction to the students concerning the lake. He responded that he told them the lake was off limits. He stated that there was a perimeter road that the students could use to get to the other encampment but they could not go inside that road toward the lake. The students were also told not to go on the side of the fence around the lake. He was asked how many feet was it from the perimeter road on each side to the lake. He responded that it varied from 20 feet to 50 feet. He thought that some areas of the perimeter road were only 20 feet from the lake.
When asked whether this was his own rule or whether this was an instruction from Tall Timbers, he replied that he did not recall getting any input from Tall Timbers. He explained that it did not seem that they needed any input since the lake was not part of the program.
*1041 Colonel Webb explained that they went over the ground rules before they ever got on the bus and made certain that everyone understood what was happening. Then, when they arrived at the campsite, they reinforced those ground rules.
Colonel Webb was asked about the location of the "capture the flag" game. He replied that the students were told that they could not go into the woods. A few students were not abiding by the rules. These students tried to go over the fence and they were told not to do that. As the colonel patrolled the area, he made certain that the students were within the boundaries set forth in the rules. He testified that nothing unusual happened during the game. To his knowledge no one tried to get into the lake and swim across the lake during the game. No one was reprimanded for going too close to the lake during the game.
Colonel Webb was asked whether the students were allowed to go around the wooded side of the lake where the road was to get to the other camp. He replied that the instructions were for the students to remain on the road. They did not want the students going off the inside toward the lake and they did not want them getting off the path to the outside because at night there was no orientation. The road itself was in bounds during the game.
He testified that the students in the game had flashlights. When they started the game it was just getting dark. The game lasted until 2:00 a.m. There was no success on either side so they finally decided to end the game.
He stated that no one from Tall Timbers participated in the game, provided any type of support for the game, or provided any type of supervision during the game. The colonel did not ask Tall Timbers to do so.
Colonel Webb testified that he was told by one of Rayvon's tent mates that Robinson was sitting in a chair outside of the tent after his partner had been captured. And then his partner returned and Rayvon, who was reading a book, did not want to go again. The colonel understood that Rayvon's partner and others left at that time. The colonel asked all of the students whether they teamed up with Rayvon again after that point and no one told him that Rayvon went out again with another partner. Colonel Webb learned that when students saw that Rayvon was not there upon their return, they assumed that he joined other students. The last time he determined that Rayvon had been seen was about 10:30 p.m. or 11:00 p.m. The colonel testified that Rayvon's tent mates said that he did not sleep in the tent that night. He stated that the tent mates assumed that Rayvon had slept in another tent with a friend.
Colonel Webb testified that he awoke around 5:00 a.m. to 5:30 a.m., after going to bed a few times that night. The cadet commander had the students fall in. The colonel asked for a head count and that was when the colonel learned that they were missing one person. The head count took place about 5:30 a.m. or 6:00 a.m. When he discovered that Rayvon was missing, he informed the other chaperones and Tall Timbers. Together with Tall Timbers' employees, they conducted a search. They decided to call the Rapides Sheriffs office. The sheriffs office responded very quickly, assessed the situation, and took over from there.
Colonel Webb stated that the next morning when he was walking around the lake, he noticed a spot where there was a sudden drop off.
Colonel Webb testified that there was no bed check by him or anyone in charge. Normally, if they were staying in a hotel, *1042 he would have a bed check at 10:00 p.m. or 11:00 p.m. and then the first thing in the morning as well. But the way this game ended and started, he did the check when he got up. He explained that there was no set time that the game would be over so they did not have all of the students at one spot at one time to account for them. He left instructions that everyone report any problems that they had and nobody did.
He stated that when he was sleeping, the other chaperones and the guardsmen were in charge. There was, however, no routine schedule for chaperone duty.
Ms. Robinson testified in her 2007 deposition that her son, Rayvon, was a senior at Bonnabel High School. He had been held back because he failed in two prior years. However, his grades improved in the 11th grade from C's and D's to A's and B's.
She testified that she met his ROTC teacher when Rayvon got an award. He had finished his ROTC training and he was going to graduate. He probably was going to go into the Army and the Army would pay for college. Rayvon had been accepted by a school.
She stated that Rayvon had no disabilities. At the time of his death he was employed at Avis-Rent-A-Car. He had been working there six or seven months. He typically worked about 62 hours over a two-week period because he was still in school. He had worked at Wendy's years before Avis. At Avis, he drove cars from one Avis location to another. Rayvon had a bank account.
She testified that Rayvon had no formal swimming training but he knew how to swim. She had seen him swim. He had no fear of the water.
On July 15, 2008, the trial judge granted the two motions for summary judgment. He concluded that there was no genuine issue of material fact as to Sam White and Tall Timbers because these defendants were immune from liability under Louisiana's Recreational Use Statute and there was no factual evidence to show that these defendants breached a duty to the plaintiffs. As to Jefferson Parish School Board, the trial judge concluded there was no genuine issue of material fact regarding its liability. The court found that "[w]hile the plaintiffs death was tragic, the undisputed facts showed that plaintiff was a 20-year old adult who was reasonably warned twice by his ROTC leader that the lake was off limits, and participation in the group activity was voluntary."
The court also concluded:
Plaintiffs point out that Col. Webb apparently went to sleep while the game was still in progress, but he was not the only supervising adult on site. Rayvon himself was an adult who had the legal capacity and right to go anywhere on his own at night.
Under those undisputed facts, it is clear that the Jefferson Parish School Board and its employees did not owe constant supervision to the deceased.
The plaintiffs have each filed timely devolutive appeals.
Demetris Robinson raises one specification of error: "The trial court erred in determining that Jefferson Parish School Board provided reasonable supervision of Rayvon Robinson."
Raynell Bailey specifies as error the trial court's finding that there were no genuine issues of material fact as to Jefferson Parish School Board as well as to Sam White and Tall Timbers.

Analysis
By its order, the Court granted the defendants' motion for summary judgment on the claims brought against them, effectively *1043 dismissing them from the case entirely.
We apply the de novo standard of review in reviewing a district court judgment on a motion for summary judgment. Gray v. Am. Nat'l Prop. & Cas. Co., 07-1670, p. 6 (La.2/26/08), 977 So.2d 839, 844 (Citation omitted). In short, we use "the same criteria that govern the trial court's consideration of whether summary judgment is appropriate, i.e., whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law." Id.
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. La. C.C.P. art. 966(A)(2). The procedure is favored and shall be construed to accomplish these ends. Id. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La.C.C.P. art. 966(B). After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted. La.C.C.P. art 966(C)(1)
The movant bears the burden of proof. La.C.C.P. art. 966(C)(2). If the movant meets this initial burden, the burden then shifts to the plaintiff to present factual support adequate to establish that he will be able to satisfy the evidentiary burden at trial. Champagne v. Ward, 03-3211, p. 5 (La.1/19/05), 893 So.2d 773, 776-77 (Citation omitted). Thereafter, if the plaintiff fails to meet this burden, there is no genuine issue of material fact and defendant is entitled to summary judgment as a matter of law. Id.

Immunity
Mr. Bailey argues on appeal that the trial judge erred in concluding that there was no genuine issue of material fact as to Sam White and Tall Timbers because these defendants were immune from liability under Louisiana's Recreational Use Statute. Ms. Robinson does not assign such error nor does she present any argument that the trial judge erred in this respect.
Louisiana's Recreational Use Statutes are contained in La.R.S. 9:2791[2] and La. *1044 R.S. 9:2795.[3]
Mr. Bailey contends that Sam White and Tall Timbers are excluded from coverage under the immunity statute for the following reasons. First, the provisions for immunity do not apply if the *1045 premises are used for profit. Mr. Bailey asserts that the fact that Tall Timbers has not made a profit does not negate the fact that Tall Timbers might be operated for the purpose of making a profit. He asserts that there was no indication that Tall Timbers is a nonprofit organization. Second, Mr. Bailey asserts that Mr. White and Tall Timbers are not excluded from immunity because the exemption does not apply for willful or malicious failure to warn against a dangerous condition, use, structure, or activity.
Mr. Bailey argues that in Van Pelt v. Morgan City Power Boat Association, Inc., 489 So.2d 1346 (La.App. 1 Cir.1986), writ granted, 493 So.2d 627 (La.1986) (cause dismissed 9/29/86), the organization in that case was a nonprofit corporation. Mr. Bailey argues that in this case Tall Timbers must prove that it is a nonprofit corporation rather than simply stating that it had no intention to make a profit. Also, he contends that since Colonel Webb testified about signing a contract, the contract showed a more formal, business nature of the activities.
The Supreme Court granted writs in Van Pelt. Therefore, we do not consider Van Pelt controlling. Rather, we conclude that the more recent Supreme Court case of Richard v. Hall, 03-1488 (La./23/04), 874 So.2d 131 is controlling. Additionally, the Van Pelt court did not hold that an organization must be a nonprofit organization to benefit from the immunity statute.
La.R.S. 9:2791(B) grants immunity to the owner or occupant of property that is not used primarily for commercial recreational purposes. Section D provides that the provisions of this section shall not apply when the premises are used principally for a commercial, recreational enterprise profit. It does not state that the provision shall not apply to a nonprofit corporation.
In Richard v. Hall, 03-1488, p. 28 (La./23/04), 874 So.2d 131, 151, the Louisiana Supreme Court recognized that the immunity statutes grant a broad immunity from liability. In Hall, the Supreme Court held that pursuant to Louisiana's Recreational Use Immunity Statutes, it was the "owner's" use of the premises and not the underlying classification of the premises as a commercial recreational enterprise for profit that determined the availability of the immunity provisions to a qualified owner. 03-1488 at 29, 874 So.2d at 152. When, as in that case, the owner/lessor operated the premises as a commercial recreational enterprise, but the lessee did not utilize the premises for a commercial profit from recreational activities, the lessee was entitled to the immunities afforded by the immunity statutes. Id. The person claiming the immunity must utilize the premises for a commercial recreational enterprise for profit to be excluded from the immunity provisions. 03-1488 at 29-30, 874 So.2d at 152.
In the present case, Mr. White's affidavit establishes that Tall Timbers did not operate the facility for profit. Instead, Tall Timbers operated at a loss and it received subsidies from the Louisiana Baptist Convention. Therefore, Tall Timbers and Sam White fall within the provisions of the Louisiana Recreational Use Statutes.
We next turn to the question of whether Tall Timbers and Mr. White willfully or maliciously violated a duty owed to the plaintiffs so as to exclude them from the immunity granted by the Recreational Use Statutes. In this regard, Mr. Bailey refers to Colonel Webb's testimony. Mr. Bailey states that everyone was aware that the ROTC activities were to take place around the lake. He points out that Colonel Webb testified that the following morning he observed a sudden drop off into the lake. Mr. Bailey opines that if Colonel *1046 Webb could observe the drop off into the lake, it was safe to assume that Tall Timbers and Mr. White were also aware of the drop off. He contends that Tall Timbers and Mr. White breached their duty to the ROTC participants to correct or warn them against dangers not known to the students.
Section B of Recreational Use Statute La.R.S. 9:2791 sets out instances when liability will not be excluded. Section B(l) does not exclude any liability which would otherwise exist for "willful or malicious failure to warn against a dangerous condition, use, structure, or activity." "A failure to warn of a dangerous condition connotes a conscious course of action, and is deemed willful or malicious when action is knowingly taken or not taken, which would likely cause injury, with conscious indifference to consequences thereof." DeLafosse v. Village of Pine Prairie, 08-0693 (La.App. 3 Cir. 12/10/08), 998 So.2d 1248, writ denied, 09-0074 (La.2/4/09), 999 So.2d 766, quoting Lambert v. State, 40,170, pp. 11-12 (La.App. 2 Cir. 9/30/05), 912 So.2d 426, 433-434 (citations omitted), writs denied, 05-2310 (La.4/17/06), 926 So.2d 509 and 05-2311 (La.4/17/06), 926 So.2d 509.
We do not find Tall Timbers and Mr. White's failure to warn of the lake and the sudden drop-off to be malicious or willful. Further, there was no showing made that Tall Timbers or Mr. White, willfully or maliciously failed to warn against a dangerous condition, use, structure, or activity. Under the language of the statutes, the defendants have statutory immunity against tort liability and owe no duty to warn campers of the existence of the lake or of its allegedly hazardous condition.
To sum up, we find that Tall Timbers and Sam White were afforded immunity pursuant to the Recreational Use Statutes. Therefore, the trial judge did not err in concluding that there were no issues of material fact as to Sam White's and Tall Timbers' liability.

Jefferson Parish School Board
Ms. Robinson argues that the trial judge erred in finding that the Jefferson Parish School Board provided reasonable supervision to Rayvon. She does not claim that the Jefferson Parish School Board should have provided constant supervision. Rather, she claims that the Jefferson Parish School Board had a duty to provide reasonable supervision. She asserts that the trial court's finding that Colonel Webb reasonably warned Rayvon twice that the lake was off limits is irrelevant and cannot provide the basis for a finding of adequate supervision.
Mr. Bailey presents a similar argument as to the Jefferson Parish School Board.
A school board, through its agents and teachers, owes a duty of reasonable supervision over students. Wallmuth v. Rapides Parish School Bd., 01-1779, p. 8 (La.4/3/02), 813 So.2d 341, 346, citing La. C.C. art. 2320; Adams v. Caddo Parish School Bd., 25,370 (La.App. 2 Cir. 1/19/94), 631 So.2d 70, writ denied, 94,684 (La.4/29/94), 637 So.2d 466. The supervision required is reasonable, competent supervision appropriate to the age of the children and the attendant circumstances. Id., citing Jackson v. Colvin, 98-182 (La. App. 3 Cir. 12/23/98), 732 So.2d 530, writ denied, 99-228 (La.3/19/99), 740 So.2d 117. This duty does not make the school board the insurer of the safety of the children. Id. Constant supervision of all students is not possible nor required for educators to discharge their duty to provide adequate supervision. Id., citing Adams, supra.
Before liability can be imposed upon a school board for failure to adequately supervise the safety of students, *1047 there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident. Id.
To establish a claim against a school board for failure to adequately supervise the safety of its students, a plaintiff must prove: (1) negligence on the part of the school board, its agents, or teachers in providing supervision; (2) a causal connection between the lack of supervision and the accident; and (3) that the risk of unreasonable injury was foreseeable, constructively or actually known, and preventable if a requisite degree of supervision had been exercised. Pugh v. St. Tammany Parish School Bd., 07-1856 (La.App. 1 Cir. 8/21/08), 994 So.2d 95, writ denied, 08-2316 (La.11/21/08), 996 So.2d 1113, citing Wallmuth, supra, 813 So.2d at 346.
Ms. Robinson argues that the undisputed facts show that Rayvon and the other students were sent out into unfamiliar woods, at night, with little or no supervision. While the students were told to employ a buddy system, the rules of the game prevented the students from following that suggestion since one of the buddies had to make his way back to the camp alone.
She points out that Colonel Webb testified that he went to bed while the game was going on. Before going to sleep he did not do a bed check, head count, or confirm in any other way that all of the students were safe and accounted for. She states that he also testified he had no procedures in place to account for the students once he turned them loose into the woods. Ms. Robinson contends that the trial court's finding that Colonel Webb reasonably warned Rayvon twice that the lake was off limits was irrelevant and could not provide the basis for a finding of adequate supervision. She also argues that the trial court's finding that there were other adults on the site is of no moment since the School Board produced no evidence that those adults were actually involved in any supervision of Rayvon.
Mr. Bailey also argues that the School Board breached its duty by failing to adequately supervise Rayvon. He contends that it was foreseeable that an accident could occur around the lake even if the students were advised not to enter the lake. He states that the purpose of the game was to run around the lake to capture the flag of the opposing team. He opines that it was more conceivable than not that an accident could occur.
Mr. Bailey contends that the School Board allowed the field trip without any policies regarding the safety precautions or instructions for the chaperones. In particular, he refers to Colonel Webb's testimony that the chaperones had no assigned responsibilities.
Additionally, Mr. Bailey argues that it was safe to assume that Colonel Webb could have discovered the drop off if he had taken the time to complete the initial site survey before the trip or if he had walked around the lake before nightfall. As such, Mr. Bailey contends that Colonel Webb could have warned the students of the potential hazard.
In Hunter v. Evergreen Presbyterian Vocational School, 338 So.2d 164, 164, 165 (La.App. 2 Cir.1976), the parents of decedent, a moderately to severely retarded young man, filed a wrongful death action against a vocational school. Their son drowned in a pond on the school's premises. The trial court rejected the plaintiffs' demands against the school, finding no breach of duty by the school or its personnel. The Second Circuit affirmed the judgment.
The principal issue in Hunter was whether the standard of care owed by the *1048 school to the decedent required continuous supervision throughout the day. The Court found that during the decedent's three and one-half years at the school, he had given no indication that he was dangerous to himself. Id., 338 So.2d at 165. There was an insufficient basis upon which to give the school notice that continuous supervision was necessary for the decedent's safety. Id.
Rayvon, who was aged 20, had no disabilities. He was gainfully employed and doing well academically. Rayvon was even more capable than the decedent in Hunter. He was warned not to go near the lake. The School Board's duty did not include constant supervision.
In Lemelle v. State, Through Bd. of Secondary & Elementary Educ, 435 So.2d 1162, 1163 (La.App. 3 Cir.1983), the plaintiff, an adult vocational-technical student brought an action for damages against the school and others. He alleged that he severely injured his left knee when a sheet of steel fell on him. Lemelle had been a student at the vocational school for more than six months at the time of the accident. He had been given instructions regarding the use of the acetylene torch as one of his first activities at the school. The Third Circuit concluded that as a 29-year-old mature adult, he should have been able to carry out his teacher's instructions to cut the metal without the need of supervision.
Likewise, as a 20-year-old mature young man, Rayvon should have been able to carry out Colonel Webb's instructions that the lake was off limits without the need of supervision. Therefore, the trial judge did not err in concluding that the Jefferson Parish School Board and its employees did not owe constant supervision to the deceased to ensure that he obeyed the instruction that the lake was off limits. As such, the trial judge properly found that there were no issues of material fact as to Jefferson Parish School Board's liability.

Decree
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
WINSBERG, J., dissents with reasons.
WINSBERG, J., dissents with reasons.
I respectfully dissent. The placing of urban high school students of any age into an unknown rural setting at night, near a lake with dangerous drop-offs, creates a genuine issue of material fact in and of itself. There was no plan in place by the organizers, or supervision by the so-called chaperones, and they lacked training in the "game" that went on into the early hours of the morning. For these reasons, I conclude that this is not a fact situation that should be subject to a summary judgment.
NOTES
[1] On September 19, 2007, the father moved to dismiss Southern Baptist Camping Association. On that day, the trial judge granted the motion and dismissed this defendant from the father's suit, without prejudice as requested.
[2] La.R.S. 9:2791 provides:

A. An owner, lessee, or occupant of premises owes no duty of care to keep such premises safe for entry or use by others for hunting, fishing, camping, hiking, sightseeing, or boating or to give warning of any hazardous conditions, use of, structure, or activities on such premises to persons entering for such purposes, whether the hazardous condition or instrumentality causing the harm is one normally encountered in the true outdoors or one created by the placement of structures or conduct of commercial activities on the premises. If such an owner, lessee, or occupant gives permission to another to enter the premises for such recreational purposes he does not thereby extend any assurance that the premises are safe for such purposes or constitute the person to whom permission is granted one to whom a duty of care is owed, or assume responsibility for or incur liability for any injury to persons or property caused by any act of person to whom permission is granted.
B. This Section does not exclude any liability which would otherwise exist for deliberate and willful or malicious injury to persons or property, nor does it create any liability where such liability does not now exist. Furthermore the provisions of this Section shall not apply when the premises are used principally for a commercial, recreational enterprise for profit; existing law governing such use is not changed by this Section.
C. The word "premises" as used in this Section includes lands, roads, waters, water courses, private ways and buildings, structures, machinery or equipment thereon.
D. The limitation of liability extended by this Section to the owner, lessee, or occupant of premises shall not be affected by the granting of a lease, right of use, or right of occupancy for any recreational purpose which may limit the use of the premises to persons other than the entire public or by the posting of the premises so as to limit the use of the premises to persons other than the entire public.
[3] La.R.S. 9:2795 pertinently provides:

A. As used in this Section:
(1) "Land" means urban or rural land, roads, water, watercourses, private ways or buildings, structures, and machinery or equipment when attached to the realty.
(2) "Owner" means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises.
(3) "Recreational purposes" includes but is not limited to any of the following, or any combination thereof: hunting, fishing, trapping, swimming, boating, camping, picnicking, hiking, horseback riding, bicycle riding, motorized, or nonmotorized vehicle operation for recreation purposes, nature study, water skiing, ice skating, roller skating, roller blading, skate boarding, sledding, snowmobiling, snow skiing, summer and winter sports, or viewing or enjoying historical, archaeological, scenic, or scientific sites.
(4) "Charge" means the admission price or fee asked in return for permission to use lands.
(5) "Person" means individuals regardless of age.
B. (1) Except for willful or malicious failure to warn against a dangerous condition, use, structure, or activity, an owner of land, except an owner of commercial recreational developments or facilities, who permits with or without charge any person to use his land for recreational purposes as herein defined does not thereby:
(a) Extend any assurance that the premises are safe for any purposes.
(b) Constitute such person the legal status of an invitee or licensee to whom a duty of care is owed.
(c) Incur liability for any injury to person or property caused by any defect in the land regardless of whether naturally occurring or man-made.
(2) The provisions of this Subsection shall apply to owners of commercial recreational developments or facilities for injury to persons or property arising out of the commercial recreational activity permitted at the recreational development or facility that occurs on land which does not comprise the commercial recreational development or facility and over which the owner has no control when the recreational activity commences, occurs, or terminates on the commercial recreational development or facility.
. . . .
E(2)(a) The limitation of liability provided in this Section shall apply to any lands, whether urban or rural, which are owned, leased, or managed as a public park by the state or any of its political subdivisions and which are used for recreational purposes.
(b) The provision of supervision on any land managed as a public park by the state or any of its political subdivisions does not create any greater duty of care which may exist and does not create a duty of care or basis of liability for personal injury or for damage to personal property caused by the act or omission of any person responsible for security or supervision of park activities, except as provided in Subparagraph (E)(2)(d) of this Section.
(c) For purposes of the limitation of liability afforded to parks pursuant to this Section this limitation does not apply to playground equipment or stands which are defective.
(d) The limitation of liability as extended to parks in this Section shall not apply to intentional or grossly negligent acts by an employee of the public entity.
F. The limitation of liability extended by this Section to the owner, lessee, or occupant of premises shall not be affected by the granting of a lease, right of use, or right of occupancy for any recreational purpose which may limit the use of the premises to persons other than the entire public or by the posting of the premises so as to limit the use of the premises to persons other than the entire public.