FREDERICKA HOMBERG WICKER, Judge.
|2The plain tiffteppellant, Ms. Kelle Coward, appeals from a trial court judgment granting the defendant/appellee’s, Dr. Guy Cresson, motion for summary judgment. For the following reasons, we affirm the trial court judgment.
Factual and Procedural Background
Ms. Coward recited the facts as follows in her affidavit.
In mid-June of 2003, Ms. Coward stated that she was experiencing pain and swelling on the right side of her face. She contacted her cousin, a general dentist in Arkansas, and asked him to prescribe an antibiotic for her. He agreed to do so, only if she saw a dentist immediately. Ms. Coward began to take the Penicillin her cousin prescribed for her, as well as her mother’s Vicodin.
Ms. Coward stated that she visited Dr. Guy Cresson — who was recommended by a colleague — on June 23, 2003, due to the pain and swelling on the right side of her face. Ms. Coward stated that Dr. Cresson informed her that | Sshe had a broken root canal which caused an abscessed tooth and suggested she continue the antibiotic. She further stated that he felt repairing the tooth was unnecessary because all the teeth would have to be extracted for new dentures. She returned to Dr. Cresson’s office the next day to have some dental work completed, but still complained of pain and swelling. She stated that Dr. Cresson prescribed Amoxicillin 500 mg, because the Penicillin was not working and then advised her to see Dr. J. Skelly Krel-ler, an oral surgeon, for root tip removal.
Dr. Cresson took dental impressions for top dentures on July 7, 2003. Ms. Coward stated that she informed Dr. Cresson that she was still experiencing pain and swelling on her right side, adding that it had spread to her right eye and forehead area. She stated that Dr. Cresson informed her that she was experiencing those symptoms because the tissues in the area by her mouth were close together. She stated that Dr. Cresson told her not to worry, adding that she would feel much better once the oral surgery was completed and the infection and swelling were gone. She returned to Dr. Cresson’s office on July 15, 2003, to have more impressions taken. She stated that she was still in pain and requested to see an ENT, because she thought something else might be wrong. Ms. Coward stated, however, that Dr. Cresson informed her that an ENT was unnecessary.
Ms. Coward visited Dr. Kreller, the oral surgeon, on July 17, 2003, for an evaluation. During the visit, Ms. Coward informed him about the pain and swelling in her face. Ms. Coward stated that Dr.
*511 Kreller acknowledged the pain and swelling and told her that it would leave once the teeth were extracted. She returned to Dr. Cresson’s office on July 22 and 31, 2003 for more impressions. She indicated that she informed him again that the pain had spread to her right eye and forehead, adding that her face was still swollen.
|4Pr. Kreller extracted Ms. Coward’s upper teeth on August 1, 2003. The denture was immediately fitted, and the swelling went down — only to return later. Ms. Coward returned to Dr. Kreller’s office on August 8, 2003, at which time he drained the area of the swelling in her face. He informed her to use moist heat, a saline rinse and to keep the denture out of her mouth. She added that he also told her that it would take a while for the swelling to go down because the area had been inflamed for so long.
Ms. Coward stated that she grew more concerned about the pain and swelling and visited Dr. Cresson’s office on August 15, 2003. Because he was on vacation, she saw his associate, Dr. Miller, who sent her back to Dr. Kreller. Dr. Kreller drained the swollen area again. The swelling went away but returned. Ms. Coward contacted Dr. Kreller’s office on September 3, 2003, and informed him that the swelling had returned and that she wanted to see an ENT. Dr. Kreller informed her that an ENT was unnecessary but referred her to another oral surgeon, Dr. Anthony Indovi-na, for a “fresh” opinion. Ms. Coward stated that Dr. Indovina dug into the swollen area and removed something that resembled cottage cheese. He then referred her to Dr. John Kimble, an ENT, that same day. Dr. Kimble biopsied the area and determined that Ms. Coward had a malignant tumor in her right sinus cavity, which had spread into the eye orbit and muscles behind her eye. Dr. Kimble scheduled Ms. Coward for exploratory surgery on September 5, 2003. He then referred her to Dr. Robert Miller of Tulane Medical Center where she underwent several rounds of chemotherapy to shrink the tumor. The tumor’s response was not sufficient, and she eventually had surgery on November 28, 2003, wherein Dr. Miller removed her right eye, right sinus cavity, and right upper pallet.
|sMs. Coward filed a Petition for Damages on March 29, 2006, against Drs. Guy G. Cresson and J. Skelly Kreller, alleging they were negligent in their treatment.[1] Dr. Cresson answered the petition on April 25, 2006, and moved for summary judgment on August 4, 2011.
Drs. Richard Irwin, Andrew Schneider, and John Rainey were deposed for the case. Dr. Irwin testified about dentists’ standard of care, while Drs. Schneider and Rainey rendered opinions on causation.
Dr. Richard Irwin, a periodontist, testified that “[t]he standard of care requires that a dentist identify and diagnose all the dental pathology that a patient presents with when the dentist does an examination.” He opined that Dr. Cresson failed to meet the standard by not documenting the pathology for each individual tooth and by not correlating Ms. Coward’s symptoms and complaints to her dental condition. Dr. Irwin added that Dr. Cresson was negligent in failing to document why he prescribed Penicillin[2] for Ms. Coward, adding that Dr. Cresson should have at *512 tempted to determine the source of Ms. Coward’s pain rather than keep her on antibiotics. Dr. Irwin further opined that Dr. Cresson breached the standard of care by not referring Ms. Coward to a specialist on June 25th, once the full examination was completed without identifying the source of Ms. Coward’s pain.
Dr. Andrew Schneider, a specialist in medical oncology, testified that squamous carcinoma of the maxillary sinus was rare, but of all sinus cancers, it was the most common. He noted that the cancer is characterized by four stages. He stated that there is no bone destruction in Stage I while Stage II is characterized with bone erosion or destruction. Stage III is characterized by destruction of the bone of the posterior wall of the maxillary sinus, the subcutaneous tissue, the floor |fiof the medial wall of the orbit, the pterygoid fossa, or the ethmoid sinuses. Finally, he noted that Stage IVA involves destruction of the anterior orbital contents, skin of the cheek, pterygoid plates, infratemporal fossa, cri-briform plate, or sphenoid/frontal sinuses.[3]
Dr. Schneider opined that Ms. Coward’s cancer was in the first stage when she presented to Dr. Coward in June of 2003 and that the tumor had likely been present four to 12 weeks before that time. He opined that Ms. Coward’s condition would have been treatable with surgery in June of 2003, adding that she would not have needed chemoradiation nor lost her eye. Dr. Schneider added that Ms. Coward’s cancer remained in Stage I on August 15 because there was no evidence of bone destruction, adding that the eye was still salvageable at that time. He noted that the tumor was rapidly growing because it was poorly-differentiated and because Ms. Coward had a dramatic, rapid response to chemotherapy, explaining that tumors that respond well to chemotherapy are rapidly diving tumors. Although Dr. Schneider was unable to determine when Ms. Coward’s cancer progressed to Stage II, he opined that she was either a Stage III or IVA when Dr. Indovina diagnosed her in September, noting that her eye was not salvageable at that time.
Dr. John Rainey, the other medical oncologist, had a different opinion regarding the stage of Ms. Coward’s cancer on June 23rd. Utilizing the Staging guidelines, as well as Ms. Coward’s medical records, Dr. Rainey opined that Ms. Coward was at least a Stage III, possibly a Stage IV, when she presented to Dr. Cresson on June 23, 2003. He based his opinion on several factors. First, he noted that Ms. Coward’s symptoms in September — at the time of her diagnosis — were the same as the symptoms she was experiencing in June and July. Secondly, he 17noted that this particular tumor is slow growing and typically does not change stages in one to two months. Rather, he opined that most solid tumors take from six months to a year to change from one stage to the next. Finally, he noted that most maxillary sinus cancers are Stage III when they are diagnosed. He opined that when Ms. Coward presented to Dr. Cresson in June, her eye was unsalvageable and added that if she had been diagnosed in June by Dr. Cres-son or in July by Dr. Kreller, her outcome would not have been any different.
The trial court heard Dr. Cresson’s motion for summary judgment on September 16, 2011 and issued its judgment on October 5, 2011, wherein it granted the motion and dismissed Dr. Cresson with prejudice.
Assignments of Error
Ms. Coward assigns two errors in the trial court’s ruling.
*513 1. The trial court erred in finding that “under neither causation expert’s [sic] scenario did Ms. Coward’s cancer progress in stage during the time she was under the care of Dr. Cresson.”
2. The trial court erred in not recognizing that Dr. Cresson’s failure to diagnose the cancer and refer her to an appropriate specialist constituted a loss of a chance for a better outcome.
Discussion
We apply the de novo standard of review in reviewing a district court judgment on a motion for summary judgment. Robinson v. Jefferson Parish Sch. Bd„ 08-1224 (La.App. 5 Cir. 4/7/09), 9 So.3d 1035, 1043, writ denied, 09-1187 (La.9/18/09), 17 So.3d 975 (citation omitted). We use “the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate, i.e., whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law.” Id.
| sThe summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. La. C.C.P. art. 966(A)(2). The procedure is favored and shall be construed to accomplish these ends. Id. La. C.C.P. art. 966(B) provides that summary judgment shall be granted if “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law.” La. C.C. P. art. 966(C)(1) further adds that “after adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted.”
Ordinarily, the movant bears the burden of proof on a motion for summary judgment. La.C.C.P. art. 966(C)(2). If the movant meets this initial burden, the burden then shifts to the adverse party to present factual support adequate to establish that he will be able to satisfy the evidentiary burden at trial. Robinson, supra, at 1043, citing, Champagne v. Ward, 03-3211, p. 5 (La.1/19/05), 893 So.2d 773, 776-77. Thereafter, if the adverse party fails to meet this burden, there is no genuine issue of material fact, and the mover is entitled to summary judgment as a matter of law. Id. In medical malpractice cases, however, the plaintiff bears the initial burden of showing whether medical malpractice was committed.
La. R.S. 9:2794(A) provides: “a medical malpractice plaintiff must establish the following elements by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached the standard of care; and (3) that there was a causal relationship between the breach and the resulting injury.” See Djorghi v. Glass, 09-461, p. 2 (La.App. 3 Cir. 11/4/09), 23 So.3d 996, 998. Expert testimony is generally required for a medical malpractice plaintiff to establish the applicable standard of care and breach of that standard of 18care. Id. (citation omitted). Thus, the defendant is only required to point out that “there is an absence of factual support for one or more elements essential to the plaintiffs claim to support that there is no genuine issue of material fact.” Id.
In this case, the two causation experts, Drs. Schneider and Rainey, offered different opinions regarding the progression of Ms. Coward’s cancer. Dr. Schneider opined that Ms. Coward was in *514 Stage I on June 23, 2003 and remained in Stage I at least until August 15, 2003. Dr. Rainey opined, on the other hand, that Ms. Coward was already a Stage III, possibly a Stage IV, on June 23, 2003 at which time the eye was not salvageable. Ordinarily, summary judgment is not appropriate where the trial judge has to make a credibility determination. See Maiorana v. Melancon Metal Bldgs., Inc., 05-933 (La.App. 5 Cir. 4/25/06), 927 So.2d 700, 705. In such instances, summary judgment should be denied, and the case must proceed to trial. Although the two causation experts’ opinions differ regarding the staging of Ms. Coward’s tumor on June 23, 2003, there is no evidence that her cancer progressed between June 23 and July 17— the day she was first seen by the oral surgeon. Thus, our inquiry centers on whether Dr. Cresson’s action or inaction was the legal cause of Ms. Coward’s resulting injury.
When Ms. Coward presented to Dr. Cresson’s office on June 23, 2003, she had not sought dental treatment in two years. The record reflects that she had poor oral hygiene, fractured root canals, abscessed teeth, and an ill-fitting partial denture. After Dr. Kreller extracted fifteen of Ms. Coward’s teeth on August 1, 2003, she returned to Dr. Cresson’s office on August 5, 2003 with concerns about the upper denture being off-centered. Dr. Cresson documented, “allow the swelling to go down and the denture will go back to the lab to [illegible word] the center of the teeth.” As far as this Court can discern, this is the first notation of swelling in Dr. Cresson’s records, despite Ms. Coward’s contention otherwise. | ,nOnce Ms. Coward returned to Dr. Cresson’s office on August 7, 2003, he noted that she had swelling in the right upper area and indicated that he was sending her back to Dr. Kreller. The following day, Dr. Kreller noted a “large ulcer of the right buccal maxillary vestibule associated with the denture flange” stating that “this is causing the inflammation and the swelling in the face.” Dr. Kreller further noted that he would speak to Dr. Cresson that day. Ms. Coward presented to Dr. Cresson twice more after Dr. Kreller documented the large ulcer— once on August 11, 2003 and again on August 14, 2003 where he clearly noted in her record, “will be evaluated tomorrow by Dr. Kreller.”
A physician is not held to a standard of absolute precision; rather, his conduct and judgment are evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised, and not on the basis of hindsight or in light of subsequent events. Wells v. Louisiana Dept. of Pub. Safety & Corr., 46,428 (La.App. 2 Cir. 8/24/11), 72 So.3d 910, 917, writ denied, 11-2637 (La.2/10/12), 80 So.3d 474, citing, Johnston ex rel. Johnston v. St. Francis Medical Center, Inc., 35,236 (La.App. 2 Cir. 10/31/01), 799 So.2d 671.
Based on the record before us, Ms. Coward will not be able to establish, by a preponderance of the evidence, that Dr. Cresson was legally responsible for either the loss of her eye or the loss of a chance of a better outcome.
In this case, Dr. Irwin opined that Dr. Cresson breached the standard of care by not referring Ms. Coward to an oral surgeon on June 25th after the full examination was completed without identifying the source of her pain. The record reveals, however, that Ms. Coward was examined by the oral surgeon on July 17th — approximately three weeks after Dr. Irwin opined that she should have had the examination. None of the experts opined that this three week delay contributed to the progression of Ms. Coward’s cancer, and Ms. Coward presented no otherJjjevidence that this *515 delay in treatment may have caused her to lose the opportunity to save her eye or cheek. The evidence reflects that the treatment would have been the same on June 25th and July 17th.
Ms. Coward also contends that the appropriate treatment would have been a timely referral to an ENT. None of the expert testimony, however, presented by Ms. Coward showed that Dr. Cresson’s treatment fell below the ordinary standard of care, which is an essential element a plaintiff must prove to succeed in a medical malpractice claim. See Arroyo v. East Jefferson General Hospital, 06-799 (La.App. 5 Cir. 3/13/07), 956 So.3d 661, 664, writ denied, 07-784 (La.6/1/07), 957 So.2d 179. Although Ms. Coward argues that Dr. Cresson should have referred her to an ENT, none of the expert testimony established that Dr. Cresson’s referral to an oral surgeon, as opposed to an ENT, fell below the required standard of care for a dentist.
Based on the foregoing, we find that Ms. Coward will not be able to establish that Dr. Cresson breached the requisite standard of care and that she suffered any damage as a result of Dr. Cresson’s treatment. Accordingly, the judgment appealed from is affirmed.

AFFIRMED

EDWARDS, C.J., concurs with reasons.

. The medical review panel (MRP) convened on February 9, 2006, and found that neither Dr. Cresson nor Dr. Kreller breached the standard of care.

. Ms. Coward stated in her affidavit that her cousin prescribed Penicillin and that Dr. Cresson prescribed Amoxicillin. The medical records reflect that on June 23, 2003, Ms. Coward was already taking Amoxicillin.

. Stage IVB is not implicated in this case and is therefore not mentioned.