STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-227

JOSEPH CELESTINE

VERSUS

LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT
AND ABC INSURANCE COMPANY

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2022-1397
HONORABLE CYNTHIA SPADONI, DISTRICT JUDGE
(HONORABLE MARILYN C. CASTLE, FORMERLY PRESIDING)

**********

CHARLES G. FITZGERALD
JUDGE

**********

Court composed of Candyce G. Perret, Jonathan W. Perry, and Charles G. Fitzgerald, Judges.

AFFIRMED.

**Roderick "Rico" Alvendia**
**Kurt A. Offner**
**Jeanne K. Demarest**
**Alvendia, Kelly & Demarest, LLC**
**909 Poydras Street, Suite 1625**
**New Orleans, Louisiana 70112**
**(504) 200-0000**
**Counsel for Plaintiff/Appellant:**
>        **Joseph Celestine**

**Gregory J. Chiartano**
**Law Office of Gregory Chiartano**
**3801 Canal Street, Suite 211**
**New Orleans, Louisiana 70119**
**Counsel for Plaintiff/Appellant:**
>        **Joseph Celestine**

**Frank X. Neuner**
**Katelyn B. Courville**
**Neuner Pate**
**1001 West Pinhook Road, Suite 200**
**Lafayette, Louisiana 70503**
**(337) 237-7000**
**Counsel for Defendants/Appellees:**
>        **Lafayette City-Parish Consolidated Government**
>        **ABC Insurance Company**

**FITZGERALD, Judge.**

In this trip and fall case, Plaintiff, Joseph Celestine, appeals the trial court's grant of summary judgment in favor of Defendant, Lafayette City-Parish Consolidated Government ("LCG").

Late in the afternoon on April 22, 2021, Plaintiff met a friend at Girard Park and started walking on the park's outer loop walking track. Shortly after beginning his walk, Plaintiff stepped into a hole on the track causing him to trip and fall.

Girard Park is owned by the City of Lafayette. The park is managed and operated by LCG.

In March 2022, Plaintiff sued LCG claiming damages for injuries sustained in the fall. In response, LCG answered the lawsuit and denied liability. Many months after that, LCG filed a motion for summary judgment seeking dismissal of Plaintiff's claims.

The hearing on LCG's motion was held in early December 2023. The trial court granted the motion and dismissed Plaintiff's lawsuit from the bench. This ruling was reduced to a written judgment signed on December 13, 2023. Plaintiff appealed.

On appeal, Plaintiff asserts one assignment of error: the trial court legally erred in granting LCG's motion for summary judgment and dismissing his claims with prejudice.

## LAW AND ANALYSIS

In reviewing a trial court's decision on a motion for summary judgment, this court applies the de novo standard of review using the same criteria applied by the trial court to determine whether summary judgment is appropriate. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So.2d 880.

"[A] motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(A)(3).

"A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute." *Smitko v. Gulf South Shrimp, Inc.*, 11-2566, p. 7 (La. 7/2/12), 94 So.3d 750, 755. On the other hand, "A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate." *Id*.

The burden of proof in summary judgment proceedings is set forth in La.Code Civ.P. art. 966(D)(1), which states:

> The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

"Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion." *Hays v. Autin*, 96-287, p. 6 (La.App. 3 Cir. 12/26/96), 685 So.2d 691, 694, *writ denied*, 97-281 (La. 3/14/97), 690 So.2d 41.

Here, LCG sought summary judgment on two grounds. First, LCG claimed that it was not liable for Plaintiff's injuries under Louisiana's recreational use immunity statutes. And second, LCG claimed that, even if it was not entitled to

2

immunity, summary judgment was still appropriate because Plaintiff failed to produce factual support for one or more essential elements of his underlying premises-liability claim.

### *Recreational Use Immunity*

Louisiana Revised Statutes 9:2791 provides a limitation of liability (immunity) to landowners when they allow individuals to use their property for recreational purposes. Pursuant to La.R.S. 9:2795(E)(2), the immunity applies "to any lands, whether urban or rural, which are owned, leased, or managed as a public park by the state or any of its political subdivisions and which are used for recreational purposes." Additionally, La.R.S. 9:2795(B)(1) provides that the owner of these lands does not make assurances that the property is safe, does not owe a duty of care to individuals that enter the property for recreational use, and does not become liable for injuries caused by man-made or naturally occurring defects on the property.

However, as pointed out by both Plaintiff and LCG, the immunity provided by these statutes is not absolute. For example, La.R.S. 9:2795 provides two exceptions which, if proven, will exclude immunity. The first exception concerns a landowner's "willful or malicious failure to warn against a dangerous condition[.]" La.R.S. 9:2795(B)(1). The second exception, on the other hand, covers the "intentional or grossly negligent acts by an employee of the public entity." La.R.S. 9:2795(E)(2)(d).

Now back to LCG's motion for summary judgment. In support of its motion, LCG attached numerous documents, including Plaintiff's petition, deposition transcript, and answers to interrogatories. LCG also attached affidavits of three of its employees and the deposition transcripts for those employees. This summary judgment evidence shows that Girard Park is owned by the City of Lafayette, is

3

managed by LCG, and is used as a public park for recreational purposes. The evidence also shows that Plaintiff was engaged in a recreational activity—walking on the outer track at Girard Park—when he fell. Thus, LCG has made a prima facie showing that it is entitled to recreational use immunity.

At this point, the burden shifts to Plaintiff to produce factual support for one of the exceptions to immunity. *Beal v. Westchester Surplus Lines Ins. Co.*, 21-187 (La.App. 4 Cir. 12/15/21), 334 So.3d 438, *writ denied*, 22-114 (La. 4/5/22), 335 So.3d 838. In other words, Plaintiff must produce summary judgment evidence showing that LCG willfully or maliciously failed to warn against a dangerous condition or that one of LCG's employees committed an intentional or grossly negligent act.

### Willful or Malicious Failure to Warn of a Dangerous Condition

"[A] failure to warn of a dangerous condition connotes a conscious course of action, and is deemed willful or malicious when action is knowingly taken or not taken, which would likely cause injury, with conscious indifference to consequences thereof." *Lambert v. State*, 40,170, p. 12 (La.App. 2 Cir. 9/30/05), 912 So.2d 426, 434, *writs denied*, 05-2310, 05-2311 (La. 4/17/06), 926 So.2d 509. "Willfulness cannot exist without purpose or design, and a willful injury will not be inferred when the result may be reasonably attributed to negligence or inattention." *Rushing v. State Through La. Health & Human Res. Admin.*, 381 So.2d 1250, 1252 (La.App. 1 Cir. 1980) (citing *State v. Vinzant*, 200 La. 301, 7 So.2d 917 (1942)).

In the case before us, the subject walking track winds along the outer perimeter of Girard Park for several miles and is made up of a red cinder material. The hole that Plaintiff stepped in, according to one LCG employee, was at least "six to seven inches" wide and "two to three" inches deep. Plaintiff described the hole

4

as "several inches deep and wide enough for his size 10 shoe to fit in and become stuck[.]"

Plaintiff argues that holes like the one at issue were a recurring problem, and that LCG knew of the problem "for quite some time" but willingly or maliciously failed to give a general warning about such holes. Plaintiff also argues that LCG willingly or maliciously failed to give a warning about the specific hole that caused his accident. In support, Plaintiff points to the deposition testimony of three LCG employees—Raylan Allemand, Seane Willis, and Hollis Conway—along with his own deposition testimony.

Raylan Allemand, for example, was employed by LCG for over eighteen years. He was the maintenance supervisor for approximately eight of those years, and he was in that position at the time of Plaintiff's fall. Plaintiff claims that the deposition testimony of Mr. Allemand shows that holes on the track were a recurring problem:

Q:    Have you ever been to the track at Girard Park?

A:    Yes, I have.

Q:    Have you ever witnessed holes in the track at Girard Park?

A:    Yes.

Based on that testimony, Plaintiff asserts that Mr. Allemand "has personally seen numerous holes during his tenure as Maintenance Supervisor." Yet this assertion embellishes his actual testimony:

Q:    In the eight years that you've been working as maintenance supervisor for LCG parks and rec[reation], how many holes have you seen in the track at Girard Park?

A:    Probably three.

But significantly, Mr. Allemand testified that he had never seen a hole like the one that Plaintiff stepped in:

5

Q:  [Your Affidavit] states, "During the length of my employment with LCG, I never witnessed a hole in the Girard Park outer loop walking track." But that's not quite true, is it?

A:  Yes, it would be. The others were like cave[-]ins.

Q:  Okay.

A:  This was just a hole.

. . . .

Q:  Do you know what causes a hole to form in the track at Girard Park?

A:  It could be a washout.

Q:  What's that?

A:  If you get a middle ground leakage, it'll eventually wash out.

Q:  Wash out, like the ground above?

A:  It'll collapse.

Mr. Allemand saw three holes, including the hole that Plaintiff encountered, in eight years. He described the two other holes as "cave-ins" or "washouts." And he explains below that the two cave-ins or washouts were not even on the walking track:

Q:  Didn't you testify earlier, however, that you have witnessed other holes on the Girard Park track?

A:  Yeah.

. . . .

Q:  Okay. So not on the outer loop?

A:  Right.

. . . .

Q:  Okay. So the holes that you've witnessed in the Girard Park track, were they in different areas than this hole?

A:  Yes.

6

Q:     Okay.  So you just have never seen or witnessed a hole in that same area as this hole?

A:     That's correct.

Plaintiff next contends that the deposition testimony of Seane Willis supports his claim that holes on the track were a recurring problem.  Mr. Willis has been a foreman with LCG since 2020.  He was in that position at the time of the accident.  Mr. Willis and his crew are responsible for maintaining the grounds at Girard Park.

Yet again, nothing in Mr. Willis's deposition transcript supports Plaintiff's contention.  On the contrary, Mr. Willis states that during his three years as foreman of Girard Park, he never saw a hole on the outer track:

Q:     Okay.  And have you ever seen a hole like this [that Plaintiff fell in] in the track at Girard Park?

A:     No, ma'am.

Q:     Okay.  Do you know how a hole like this would get in the ground on the track at Girard Park?

A:     No, ma'am.

Mr. Willis then describes the hole that Plaintiff stepped in as a "crazy hole":

Q:     Okay.  What makes it crazy?

A:     It's perfect.

Q:     Okay.

A:     It's--it's just a round hole.  I'm used to seeing washouts and you can see stuff around it.  I mean, that's all.  That's--it's just a crazy hole.

Q:     Okay.  Have you ever seen any holes on the track at Girard Park?

A:     Since I been in it?  No, ma'am.

Q:     Okay.  What is a washout?

A:     Around a drain, tree where water gets around and just makes a big hole.

Q:     Have you seen washouts before?

7

A:  Yes, ma'am.

Q:  Okay.  Have you seen washouts on the track at Girard Park?

A:  No, ma'am.

        . . . .

Q:  [Your Affidavit states:] "During the length of my employment with LCG, I have never seen or repaired a hole similar to the hole plaintiff allegedly stepped in"; is that true?

A:  Yes.

Q:  But you've seen other holes on the track, correct?

A:  Not on the track.

Plaintiff's reliance on Hollis Conway's testimony to create a genuine issue of material fact is also misplaced.  Mr. Conway has worked for LCG since 2020.  He became the interim director of LCG's Parks, Arts, Recreation and Culture ("PARC") department in February 2021, and he was named as the permanent director of this department six months later.  In relevant part, Mr. Conway testified as follows:

Q:  Okay.  So you guys do your best, but sometimes holes show up that are not identifies; is that fair?

A:  Since I've been here, I've only known of two instances of a hole, one at Girard and one at a different park, that were addressed immediately.  It's not something that commonly happens, as opposed that we know that after a big weekend, there's lots of trash in the park and we have to pick it up.

Q:  Yeah.

A:  So that's just not something that's been an issue. . . .

Q:  Okay.  In the Motion for Summary Judgment, on the Statement of Uncontested Material Facts, No. 8 says that, "LCG is unaware of any prior similar incidents wherein a pedestrian fell in a hole while traversing the outer loop walking track at Girard Park."  I thought you indicated to me earlier that there was maybe one or two other incidents; is that correct?

A:  No, there was a hole at Heymann Park that I'm aware of . . . .

Q:  Okay.  Are there holes in the track at Girard Park?

8

A: No.

Q: Were there holes in the track at Girard Park in April 2021?

A: When you say "holes," I know that there was a hole that he stepped in. I'm not aware of any other holes. . . .

Q: Since you've taken over as director of PARCs in July of 2021, have any pedestrians fallen in any holes in the track at Girard Park?

A: No.

Next, Plaintiff points to his own deposition testimony to show that the holes on the track are a recurring problem:

Q: Had you ever encountered a hole on Girard Park before this April 22nd accident?

A: If they had any holes in Girard Park?

Q: Uh-huh.

A: They had plenty of them.

Q: And you had observed the holes prior?

A: No. Not the hole that I fell in, but they have plenty of holes in that track.

Q: Had you ever reported those other holes that you had seen?

A: Well, I mean, they have people that work there. That's their job.

Q: Uh-huh. Right. But, otherwise, you personally, when you walked the track, didn't report?

A: I talked to one guy. I told him that, "Man, they've got holes up in there." They're lazy over there.

Q: Do you have any idea who it was that you made that comment to?

A: I forgot. I don't know the guy's name, but it was a guy. He was running it.

Q: And do you recall how recent that was prior to the April 22nd accident?

A: Oh, that's way before that happened.

However, simply stating that "they have plenty of holes in that track" is woefully insufficient to establish a genuine issue of material fact. Plaintiff's testimony is vague and conclusory. There are no specific facts as to when the holes were observed, where on the track they were observed, and whether they were similar in size and shape to the hole at issue. Furthermore, the petition does not allege that holes on the track were a recurring problem, nor does it allege that Plaintiff had observed any other holes before the accident. As explained in *Bally Case & Cooler, Inc. v. I.A. Kramer Service, Inc.*, 252 So.2d 559, 562 (La.App. 4 Cir. 1971), when the motion for summary judgment is supported by specific facts, the non-moving party "must in response set forth equally specific facts showing that there is a genuine issue for trial." Plaintiff's deposition testimony does not meet this requirement.

Nonetheless, Plaintiff then makes this argument: "Testimony confirms that holes on the 'Outer Loop' at Girard Park are a reoccurring problem that [LCG] has known about for quite some time. For this reason, [LCG] concedes that it keeps the red cinder cement mix onsite to fill the holes." Yet the testimony to which Plaintiff refers is the deposition testimony of Mr. Willis. And that testimony provides as follows:

Q: There was some testimony earlier that if a hole has been identified, there are materials on site to repair the hole right away; is that true?

A: Yes.

Mr. Willis was then questioned by counsel for LCG:

Q: I just have a quick few. Mr. Willis, you mentioned that there is material on site to fill holes.

A: Yes, ma'am.

Q: Okay. Is that the only thing that the material is used for?

10

A: No, ma'am.

Q: Okay. What other instances do you use the cinder material that's on site at Girard Park?

A: For the track, the running track, holes, just to fill in things. We just keep it--mostly it's for the track. That's what we put on the track for people to walk on.

Q: Okay. How often do you have to use that material to fill in holes on the track as opposed to needing it for something else, but the track?

A: It's not holes. It's not holes, we just--when it goes down, we just try to keep the level of it, so we just add cinder to it.

Q: Okay. And how often does it become unlevel--well, like you're describing?

A: It may take some months.

Q: And what's that caused by?

A: Rain.

Q: Okay.

A: Wear and tear.

Q: Okay. So the amount of material that's ordered and how regularly--regularly it's ordered isn't necessarily an indication of how many holes the crew has had to fill?

A: Yes, ma'am.

Q: That's correct that it's not an indication?

A: No, it's just it may--we may not put nothing down for a year or longer. It just varies.

Mr. Willis's testimony does not show that the holes on the walking track are a recurring problem; it shows the exact opposite.

In short, Plaintiff failed to produce factual support that LCG willfully or maliciously failed to warn against a dangerous condition. There was simply no evidence that holes on the track were a recurring problem, meaning there was no duty to provide a general warning. There was also no evidence that LCG knew or

should have known about the subject hole before Plaintiff's accident, meaning there was no duty to provide a specific warning about that hole. We now turn our attention to the next exception to recreational use immunity.

### *Intentional or Grossly Negligent Acts by an LCG Employee*

This exception was addressed in *Lester v. BREC Foundation*, 22-514 (La.App. 1 Cir. 11/4/22), 356 So.3d 18, *writ denied*, 23-19 (La. 3/7/23), 357 So.3d 351. In that case, the first circuit explained:

> Pursuant to La. R.S. 9:2795(E)(2)(d), the limitation of liability extended to public parks in "this Section shall not apply to intentional or grossly negligent acts by an employee of the public entity." This language contemplates the limitation of liability when injuries arise out of *acts* committed by an owner's employee - something other than a defect in the land - that *do not* rise to the level of intentional or gross negligence. Otherwise, this provision would be rendered meaningless - there would be no need to exclude immunity for an employee's intentional or grossly negligent conduct if other acts of negligence were not included within the statute's limitation of liability.

*Id*. at 26–27 (emphasis in original).

In our case, Plaintiff states that LCG was without a PARC director "for over a year prior to and at the time of" the accident. Plaintiff then contends that this led to the absence of safety protocols and documentation, resulting in LCG's "grossly negligent" failure to inspect and maintain the track at Girard Park. We disagree.

Mr. Conway was the interim PARC director "for over a year prior to and at the time of" the accident. Three months after the accident, Mr. Conway was named as the permanent PARC director. Yet there is no summary judgment evidence showing an absence of safety protocols before the accident, at the time of the accident, or after the accident. Nor is there any evidence showing that LCG employees failed to inspect and maintain the track. To the contrary, Plaintiff's assertions are directly contradicted by Mr. Conway's deposition testimony:

> Q:   Okay. So if there is no director of PARCs, who is there to give orders to the supervisors of operations and maintenance to walk

the park or the track daily to look for imperfections, such as holes or tree branches like you suggested?

[Objection omitted.]

A: So every job description, every job has a description of duties. So if there is a maintenance guy who's hired to maintain the park, you know, they're either cutting grass or they're raking leaves or they're picking up trees and so everybody, when they are hired, understands what their job is, you don't need two levels of supervisors to kind of tell them what they need to be doing. And the park--park maintenance crew typically maintains the park. So they wouldn't assume that they are not supposed to maintain the park without someone telling them.

Q: And who is ensuring that those individuals are doing their job and are walking the park every day?

[Objection omitted.]

A: So we have advantages of that. You have the supervisor who's there, you have their manager. If there's no director there, it still goes through two layers.

. . . .

Q: In your opinion, if Lafayette Consolidated Government had had a director of PARCs in place in April 2021, do you think it would have been less likely that this accident would have occurred?

[Objection omitted.]

A: I think the same process was in place whether the director was there or not. And I think the likely outcome probably still would have happened, because I don't think it's because of a lack of a director that the hole appeared unbeknownst to anyone, and it just happened at a time in between being surveyed.

Additionally, Mr. Willis, who supervised the three-man crew assigned to Girard Park, testified about the safety protocols, procedures, and daily practices of LCG's employees:

Q: So whose responsibility is it to actually identify when there are hazards in the park?

A: I go through the park.

Q: You?

13

A:    Yes, I go through the park and check to make sure they got branches down, anything.

Q:    And I'm going to get more specific with you. Whose job is it to identify holes in the track at Girard Park?

A:    Whoever is on the track or walking it or ride [sic], they will refer to me and we'll just go fill it in.

Q:    Do you have a certain member of your crew that is assigned to walk Girard Park track?

A:    No, we all do it.

Q:    You all do it?

A:    We all take--we all take the time to go through the park.

Q:    Okay. But when you say you all take a time to go through the park, does that include walking the track?

A:    Yes, ma'am.

. . . .

Q:    Okay. Have you ever been given a manual, like a packet, a big thing of paper, with policies and procedures that you're expected to follow as an employee of Lafayette Consolidated Government?

A:    Everybody gets that when you first get on with the City.

Q:    How many times a day is the track at Girard Park walked by your crew?

A:    It varies, because we've got a lot of people walking the track. So it's--you may go twice a day, maybe three times a day, it depends. It just depends how busy the track, if you got a lot of people running.

. . . .

Q:    [I]'m more concerned with when you and your crew are walking the track as part of your employment duty. So how often does that occur?

A:    From--in the morning, we do it in the morning and before we get off at 4 o'clock.

Q:    Okay.

14

A:     So before we leave, we go around.

Despite the lack of formal inspection schedules and time reports on when the track was walked, LCG had layers of safety protocols, procedures, and practices in place to address any issue with the Girard Park track. On this point, Mr. Willis's deposition testimony further provides:

Q:     Okay. Were there ever days that your crew did not make it to the track at Girard Park because you were busy doing other things or whatever?

A:     Not--that I think of or know of.

Q:     Is there anything that would prevent your crew from walking the track at Girard Park?

A:     No, ma'am.

Q;     What about inclement weather?

A:     If it's raining, I mean, they not going to go out when it's pouring down rain, because we don't have slick--slicker suits. We have to wait until the rain stop[s] to go out and check and make sure there's no big puddles or something--branches down on the ground. . . .

Q:     What about being understaffed, is that a reason why the crew may not--may not make it out there?

A:     If we're shorthanded, somebody will step up.

Q:     Okay.

A:     If--if they're not there, I'll step up and if I'm not there, someone will step in my spot.

Q:     Okay. So can you confidently say 100 percent without a doubt, that your crew walked the track at Girard Park every day in 2021?

A:     Yes.

Q:     Can you confidently say, without a doubt, without notes or records to refer to, that your crew definitely walked the track at Girard Park on April 22nd, 2021?

A:     I'd say yes.

15

Q:     And can you confidently say, without a doubt, that your crew walked the track on April 21st, 2020--April 21st, 2021?

A:     Yes.

Mr. Conway's testimony then adds more detail about the maintenance of

Girard Park:

Q:     Sure.  There should not be holes in the track at Girard Park, absent maintenance, there being a maintenance issue, correct?

[Objection omitted.]

A:     The way I'm understanding it is that the hole was there because we didn't maintain it and so I wouldn't agree with that.

Q:     Okay.  On what basis do you not agree with that?

A:     Because I would--I would assume it's similar to a tree branch fell and we say it's because we didn't maintain it.  Our maintenance crews, if they walk the track or they walk the park every day, if they see things that unexpectedly happen, they address it.  So a hole would be something that's unexpected, that we can't control how it got there, but we can address it once it's there.

       We will try to determine how it got there to prevent it from happening.  We always do preventive measures, but I just understood the question as saying the hole was there because we failed to maintain the track, so I wouldn't agree with that statement.

       . . . .

Q:     Okay.  So every day, the maintenance department walks the Girard track, did I get the correct?

A:     Yes, they survey the--they survey the whole park.

       . . . .

Q:     Okay, got it.  What could Lafayette Consolidated Government have done differently in April 2021, to prevent this incident from happening?

[Objection omitted.]

A:     Yeah, the way I received that question, we have--we have our maintenance departments monitor the parks for safety, and address issues immediately.  And unfortunately, there's sometimes when things happen that--that unbeknownst to us, and

16

we try to address them quickly. So I think we have a very effective process in place that has worked very well. So I don't know of anything different from that.

. . . .

Q: And this is a hypothetical, but if one of your employees in maintenance and operations is at Girard Park, or had been at Girad Park, and identified a hole, what is the appropriate policy and procedure to go from there?

A: They would fill the hole, unless it's something that requires major maintenance.

Q: Okay.

A: It's similar to if a tree branch down, they know to pick the tree branch up.

In *Beal*, 334 So.3d 438, the plaintiff filed suit after tripping and falling on a tree root in a public park. The defendants moved for summary judgment, claiming immunity under the recreational use statutes. The trial court agreed and granted the motion. Plaintiff appealed. In affirming the trial court's decision, the fourth circuit emphasized the deposition testimony of the operations manager, who testified that he and another employee inspected the property prior to the accident and that the maintenance and grounds keeping were provided year-round.

By comparison, LCG has a maintenance crew specifically assigned to Girard Park. And although LCG manages and maintains twenty-seven parks in Lafayette Parish, Girard Park is the only park that has a full-time foreman and maintenance crew.

Similarly, in *Bailey v. Department of Culture Recreation and Tourism*, 21-227 (La.App. 1 Cir. 11/4/21), 332 So.3d 679, the plaintiff was injured in a slip and fall in a state park. The defendant sought immunity under the recreational use statutes. The trial court granted summary judgment. In affirming this ruling, the first circuit addressed the actions of the park's employees in maintaining the park:

Mr. Broussard also testified extensively regarding Cypremort Park's maintenance and safety practices. Mr. Broussard stated that he and other Cypremort Park employees are trained to recognize slip or trip hazards throughout the property, including dirt, mud, uneven surfaces, and gaps or cracks in concrete walkways. Mr. Broussard further stated that employees often perform repairs on the property, and that while general repairs such as tending to a leaky faucet were not always documented in the maintenance log because Cypremort Park was short staffed and the employees were usually very busy, he expected to be notified about unsafe conditions and repairs made to same. Specifically regarding repairs to the concrete walkways under cabins, like the area where Mr. Bailey fell, Mr. Broussard recalled repairs being made throughout his tenure at Cypremort Park, both before and after Mr. Bailey's fall. Additionally, quarterly inspections were conducted to identify safety hazards throughout Cypremort Park. Mr. Broussard recalled meeting with Mr. Bailey after his fall and preparing an incident report. Because the undisputed evidence demonstrates reasonable efforts to maintain the safety of Cypremort Park, the State was clearly not grossly negligent, nor did the State act with intent to cause injury or with indifference to the consequences of its actions.

*Id*. at 688 n.2.

With a few slight changes, the above testimony could be straight from the depositions given in the case before us. In short, Plaintiff has not produced any summary judgment evidence showing that an LCG employee was grossly negligent. Nor has Plaintiff produced any evidence showing that an LCG employee acted with the intent to cause injury.[1]

To summarize, LCG made a prima facie showing that it was entitled to recreational use immunity. The burden of production then shifted to Plaintiff. But Plaintiff failed to produce factual support sufficient to establish the existence of a genuine issue of material fact. Thus, the trial court properly granted LCG's motion for summary judgment.[2]

---

[1] Plaintiff also argues that the deposition testimony of the LCG employees contradicts the statements made in their sworn affidavits, thereby creating a genuine issue of material that precludes summary judgment. This argument lacks merit. There are no such contradictions.

[2] Based on our disposition, we pretermit any discussion of LCG's other grounds for summary judgment.

18

## DISPOSITION

The trial court's judgment of December 13, 2023, is affirmed.  The costs of this appeal are assessed to Plaintiff, Joseph Celestine.

**AFFIRMED.**